CONCORD INSTRUMENTS CORPORATION, f.k.a. CONCORD CONTROL, INC., ET Al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Concord Instruments Corp. v. Commissioner
Docket Nos. 15863-90, 2294-91, 20520-91
United States Tax Court
T.C. Memo 1994-248; 1994 Tax Ct. Memo LEXIS 244; 67 T.C.M. (CCH) 3036; May 31, 1994, Filed *244 For petitioner: Michael I. Saltzman and Barbara T. Kaplan. For respondent: Nancy B. Herbert and Jeffrey L. Bassin. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies and additions to tax in petitioner's Federal income tax as follows: Docket No.
Year Ending
Deficiency 15863-90
Nov. 30, 1968
$ 39,130
15863-90
Nov. 30, 1971
705,986
15863-90
Dec. 31, 1972
702,993
15863-90
Dec. 31, 1975
172,732
15863-90
Dec. 31, 1982
483,928
15863-90
Dec. 31, 1983
16,383
Addition to Tax Docket No.
Year Ending Deficiency
Sec. 6661 2294-91
Dec. 31, 1984
$ 135,602
$ 33,900.50
2294-91
Dec. 31, 1985
71,455
17,863.75
Docket No.
Year Ending Deficiency
20520-91
Dec. 31, 1986
$ 18,936
20520-91
Dec. 31, 1987
165,618
These three cases were consolidated for trial, briefing, and decision. After concessions, the following issues remain to be decided: 1. Whether petitioner's additions to its bad debt reserve for 1982, 1984, and 1985 were reasonable. We hold that they were not. 2. Whether petitioner may deduct accrued interest of $ 78,476 in 1982, the year it must include in income certain payments *245 which led to the accrued interest, or $ 90,281 in 1983, the year petitioner filed amended tax returns. We hold that it may deduct $ 78,476 in 1982. 3. Whether petitioner may deduct payments for season tickets for professional sports teams as advertising or promotion expenses. We hold that it may not. 4. Whether petitioner may deduct fees for certain legal services rendered to its president and sole shareholder. We hold it may not. 5. Whether petitioner may accrue in 1982 a $ 510,455 deduction for a payment relating to its pension plan. In 1982, petitioner's lawsuit with the Pension Benefit Guarantee Corp. (PBGC), which raised issues relating to the jurisdiction of the court, the statute of limitations, and the amount of petitioner's liability was still pending. We hold that petitioner may not accrue the deduction in 1982, but may deduct $ 243,677 in pension expenses and $ 118,607 in interest for 1984. 6. Whether petitioner's cost of installing a new and larger water pump and housing in its fire sprinkler system is a repair expense or capital expenditure. We hold that it is a capital expenditure. 7. Whether petitioner has shown that it had no reasonable prospect of *246 recovery from its insurer (in excess of a partial payment) before it made its final claim for fire damage. We hold that petitioner has not. 8. Whether, under section 461(f), petitioner may deduct $ 201,810 as a litigation loss in 1985 and $ 52,000 for related interest expense in 1987. We hold that it may not. 9. Whether a legal malpractice settlement payment made to petitioner because its counsel failed to timely file a notice of appeal is includable in income. We hold that it is not, except for the part of the payment which was based on amounts previously deducted as interest. 10. Whether, as respondent contends, section 1.1012-1(c), Income Tax Regs., provides the exclusive means for petitioner to identify stock to be sold to avoid using the first-in, first-out (FIFO) accounting method to calculate gain on the sale. We hold that it provides a safe harbor and not the exclusive means to identify stock. 11. Whether petitioner is liable for additions to tax for substantial understatement of tax under section 6661 for 1984 and 1985. We hold that it is not. Another issue relating to petitioner's inventory writedowns for 1975 will be decided separately. References to petitioner *247 are to Concord Instruments Corp., and its predecessors, Concord Control, Inc., and K-D Lamp Co. Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. This opinion is organized as follows: I. General Findings of Fact -- Background
Petitioner manufactures truck safety equipment such as switch lights, mirrors, reflectors, and cab, side, and tail lights. Its factory and office is in Cincinnati, Ohio. Andrew Stone (Stone) has owned all of the stock of petitioner and its predecessors, Concord Control, Inc., and the K-D Lamp Co. since 1964. Stone had also been president and 75-percent shareholder of a corporation called Chromcraft Co. (Chromcraft) which was unrelated to petitioner. Chromcraft manufactured furniture. Stone was involved in all phases of petitioner's business, including engineering, management, production, sales, and finance. Petitioner's comptroller, credit manager, and production control manager reported to Stone during the years in issue. Petitioner used the accrual method to compute income for book and tax purposes for all of the years in issue. Clark, *248 Schaefer, Hackett & Co. (Clark, Schaefer) is an accounting firm with offices in Cincinnati and four other places. Joseph Rumpler (Rumpler) and other Clark, Schaefer personnel went to petitioner's offices and factory many times to do the annual audits. Clark, Schaefer prepared petitioner's corporate income tax returns from 1969 to 1989. Clark, Schaefer used audit information to prepare petitioner's tax returns. Clark, Schaefer obtained amounts from the general ledger, reviewed most of petitioner's significant transactions and activities, and discussed many items with company personnel. Clark, Schaefer tax specialists reviewed tax-related items. II. Bad Debt Deductions
A. Findings of Fact
1. Background
Petitioner used the reserve method to calculate its tax deduction for bad debts in all relevant years. It used a two-part calculation consisting of a historical method and a specific accounts method. First, petitioner took into account its bad debt history using a formula similar to that in Black Motor Co. v. Commissioner, 41 B.T.A. 300 (1940), affd. 125 F.2d 977 (6th Cir. 1942), to compute a bad debt *249 reserve. Second, petitioner added the amounts of any significant questionable accounts to the reserve. Petitioner added both amounts to its reserve for bad debts and deducted them. At the end of each year, petitioner reviewed its accounts receivable records with Clark, Schaefer and identified past due accounts. Petitioner's credit manager and Clark, Schaefer discussed accounts that petitioner's credit manager believed were questionable. They reviewed the credit manager's files, and considered the age of the account, the date of the last payment, the current status of the customer, and collection efforts by petitioner. When petitioner believed an adjustment was appropriate, it sought the concurrence of the credit manager and Clark, Schaefer. Petitioner did not add any account to the bad debt reserve unless it had made extensive efforts to collect the amount due and the account had been delinquent for some time. 2. White Motor
White Motor Corp. (White Motor) was one of petitioner's customers. In the first half of 1980, White Motor's sales declined by 30 percent and it lost $ 46 million. By September 1980, petitioner's accounts receivable from White Motor were about $ *250 116,904. On September 4, 1980, White Motor filed a voluntary petition in bankruptcy for reorganization under chapter 11. Thereafter, petitioner continued to sell to White Motor, but required payment in full on the date of delivery. These payment terms were more stringent than those imposed on petitioner's customers that were not financially troubled. White Motor was more than 120 days delinquent as of December 31, 1980. Petitioner added White Motor accounts receivable to its bad debt reserve. Petitioner claimed a $ 116,904 bad debt deduction on its Federal income tax return for 1980 based on the White Motor accounts receivable. In 1981, 1982, and 1983, petitioner recovered a total of $ 61,761 of this amount from White Motor and included the amount recovered in income. 3. Other Debtors
Petitioner followed the procedure described above for each of its debtors listed below. Petitioner added each account receivable to its bad debt reserve at the end of the years shown: Debtor
Amount
Year
American-Strevell, Inc.
$ 7,333
1982
Carteret Truck Parts/
13,787
1982
Posner Brake Service
Coastal Air Brake Co., Inc.
2,640
1983
Diversified Sales Co.
5,922
1983
Howe Engineered Sales Co., Inc.
2,505
1983
Huntington Fleet Service
3,000
1982
Moanalulu Carriage Shop, Ltd.
1,486
1982
Morysville Body Works, Inc.
2,271
1983
Old Dominion
5,761
1980
Precision Auto Parts, Inc.
1,227
1983
T&T Parts Warehouse, Inc.
1,473
1982
T&T Parts Warehouse, Inc.
2,255
1983
Truck Suppliers
4,457
1983
Universal Container Parts
11,623
1982
& Services, Ltd.
*251 Petitioner tried to collect from the following accounts during and after the years it added them to its bad debt reserve: American-Strevell, Inc., Carteret Truck Parts, Diversified Sales Co., Huntington Fleet Service, Moanalulu Carriage Shop, Ltd., Morysville Body Works, Inc., Precision Auto Parts, Inc., T & T Parts Warehouse, Inc., Truck Suppliers, and White Motor Corp. Petitioner deducted the debts of Diversified Sales Co., Coastal Air Brake Co., Inc., Precision Auto Parts, Inc., Moanalulu Carriage Shop, Ltd., and Howe Engineered Sales Co., Inc., for book purposes in years after adding them to its bad debt reserve. B. Opinion
1. Background
Respondent disallowed the addition of the specific accounts to petitioner's bad debt reserve for 1982, 1984, and 1985 and reversed petitioner's prior addition of the White Motor account. [2] Petitioner argues that the accounts it added to its bad debt reserve were extraordinary credit reversals and thus may be added to its reserve under Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 549-550 (1979). *252 A taxpayer may deduct any debt which becomes worthless in the taxable year using the specific chargeoff method. Sec. 166(a). [3] *253 In lieu of the specific chargeoff method, an accrual method taxpayer may deduct (in the Secretary's discretion) a reasonable addition to a reserve for bad debts. Sec. 166(c). [4]
A reasonable addition to a reserve for bad debts is the amount needed to raise the reserve balance to the level expected to cover losses properly anticipated on debts outstanding at the end of the tax year. Thor Power Tool Co. v. Commissioner, supra at 546. The reasonableness of an addition to a bad debt reserve must be viewed in light of conditions as they existed at the close of the taxable year. Massachusetts Business Dev. Corp. v. Commissioner, 52 T.C. 946, 956 (1969). *254 What constitutes a reasonable addition to a bad debt reserve depends on the facts and circumstances, including the nature of the business, general business conditions, past experience in collecting accounts and bad debts, and the amount of the existing reserve. Mill Factors Corp. v. Commissioner, 14 T.C. 1366, 1372 (1950); see Black Motor Co. v. Commissioner, 41 B.T.A. 300, 304 (1940), affd. on other grounds 125 F.2d 977 (6th Cir. 1942). If the existing reserve is adequate to cover expected losses, further additions are unreasonable. James A. Messer Co. v. Commissioner, 57 T.C. 848, 864 (1972). Petitioner argues that the additions of specific accounts to its bad debt reserve involve extraordinary credit reversals. In Thor Power Tool Co. v. Commissioner, supra at 549, the Supreme Court said: If a taxpayer's most recent bad-debt experience is unrepresentative for some reason, a formula using that experience as data cannot be expected to produce a "reasonable" addition for the current year. If the taxpayer suffers an extraordinary *255 credit reversal (the bankruptcy of a major customer, for example), the "six-year moving average" formula will fail. In such a case, where the taxpayer can point to conditions that will cause future debt collections to be less likely than in the past, the taxpayer is entitled to -- and the Commissioner is prepared to allow -- an addition larger that Black Motor would call for. * * * [Fn. refs. omitted.] We are not convinced that petitioner suffered extraordinary credit reversals. The specific accounts receivable that petitioner added to its bad debt reserve are small compared to petitioner's annual sales. Petitioner reported the following information on Schedule F of its tax returns: Accounts
Bad Debt
Receivable
Sales on
Reserve Year
at Yearend
Account at Yearend
1977
$ 1,735,954
$ 10,884,642
$ 30,000
1978
2,131,377
12,893,513
30,000
1979
2,645,196
13,745,181
360,987
1980
2,154,613
10,554,903
463,138
1981
1,888,974
11,684,541
434,232
1982
1,475,273
10,123,867
71,000
1983
2,085,222
11,407,899
94,500
1984
1,805,499
14,935,669
91,800
1985
1,754,524
13,383,201
95,500
We are not convinced that the $ 116,904 White Motor *256 account receivable in 1980 or any of the accounts added to the bad debt reserve for 1982, 1984, or 1985 were those of major customers, or that they caused petitioner to suffer an extraordinary credit reversal. The rule for evaluating the reasonableness of a taxpayer's reserve "is that the taxpayer must act on the basis of knowledge available to him at the end of the taxable year; however, a reviewing court, lacking the taxpayer's first hand knowledge, may look to the taxpayer's subsequent loss experience for guidance." Thompson v. Commissioner, 761 F.2d 259, 269 (6th Cir. 1985), affg. in part, revg. in part and remanding T.C. Memo. 1983-81. Here, White Motor filed for bankruptcy protection to reorganize under chapter 11. Petitioner continued to do business with White Motor after White Motor filed for bankruptcy protection. Petitioner recovered a substantial portion of its debt from White Motor after White Motor filed for bankruptcy. We are not convinced that any accounts receivable that petitioner added to its bad debt reserve at issue were reasonable. 2. Abuse of Discretion Standard
Petitioner has the heavy burden *257 of proving that respondent's determination of the allowable deductions for additions to the bad debt reserve was so unreasonable and arbitrary as to be an abuse of discretion and that petitioner's claimed additions to its reserve were reasonable. Thor Power Tool Co. v. Commissioner, supra at 532-532, 547-549; Roth Steel Tube Co. v. Commissioner, 68 T.C. 213, 219 (1977), affd. 620 F.2d 1176, 1179 (6th Cir. 1980). Petitioner contends it has made this showing. Whether an abuse of discretion has occurred is a question of fact. Rodebaugh v. Commissioner, 518 F.2d 73, 75 (6th Cir. 1975), affg. T.C. Memo. 1974-36. Respondent's determination was based on petitioner's credit experience, which is the best basis to determine a reasonable addition to a bad debt reserve. Thor Power Tool Co. v. Commissioner, 439 U.S. at 549. An example of how to apply prior credit experience is the widely accepted formula based on a moving 6-year average of accounts receivable used in Black Motor Co. v. Commissioner, supra. *258 We conclude that petitioner has not shown that respondent's determination was an abuse of discretion. Petitioner argues that its reserve was inadequate. Petitioner charged $ 616,350 for 1979 to 1983 against its bad debt reserve. Respondent determined that the total amount that petitioner should have charged to the reserve for that period was $ 459,015. The difference is $ 157,335. Petitioner did not convince us that respondent's determination is incorrect or an abuse of discretion. Under respondent's determination of both the additions to and subtractions from the reserve for worthless accounts, the reserve is sufficient and presumed to be correct. Petitioner has not convinced us that respondent's determination was an abuse of discretion. Thus, we sustain respondent's determination. III. Accrued Interest Expense Deduction
A. Findings of Fact
Petitioner collected from its customers excise taxes which were arguably imposed by section 4061 on certain items sold to them (disputed items). Petitioner did not remit the excise taxes to respondent because it was not clear that section 4061 applied to the disputed items. Petitioner kept the unremitted excise taxes *259 until application of the excise tax was clarified. Petitioner established an excise tax reserve and had books and records sufficient to identify amounts and customers for whom it held unremitted excise taxes. In 1971 or 1972, the Internal Revenue Service (IRS) ruled that the excise tax did not apply to the disputed items. See Concord Instruments Corp. v. Commissioner, T.C. Memo. 1992-589. Petitioner then refunded excise taxes collected on the disputed items to any customer who requested them. Not all customers requested a refund. As a result, petitioner accrued interest on an account payable to customers for improperly collected excise taxes. We will refer to this interest as excise tax interest. On its tax returns for 1974 to 1981, petitioner deducted excise tax interest in amounts of $ 85,076 for 1974, $ 60,829 for 1975, $ 58,096 for 1976, $ 56,741 for 1977, $ 49,336 for 1978, $ 48,663 for 1979, $ 106,235 for 1980, and $ 97,326 for 1981. Petitioner also accrued deductions before 1982 for interest on unpaid income tax as if the excise tax reserve were properly includable in income for 1971. Petitioner did not include the excise tax reserve *260 in its 1971 income. In Concord Instruments Corp. v. Commissioner, supra, the parties disputed the proper year to include the excise tax reserve in income. In that case we held that the unremitted excise taxes were includable in petitioner's income in 1982 because the statute of limitations first precluded customers from making claims for unrefunded excise taxes in that year. Thus, beginning in 1982, customers no longer could claim unrefunded excise taxes or related interest. As a result of our decision in Concord Instruments Corp. v. Commissioner, supra, petitioner, in March 1983, filed amended tax returns for 1974 to 1981 to eliminate accrued excise tax interest. This increased petitioner's income tax liability for those years. Thus, interest accrued on petitioner's additional Federal income tax liability for 1974 to 1981. Petitioner filed its 1982 return in June 1983. Petitioner included in income for 1982 the unremitted and unrefunded excise taxes. Also on that return, petitioner deducted accrued interest of $ 78,476 for the additional Federal income tax for which it was liable for 1974 to 1981 due to *261 the eliminated excise tax interest deductions. Respondent determined that petitioner should have accrued the interest on the additional income tax liability for 1974 to 1981 in 1983 when petitioner filed the amended returns, not in 1982, and that petitioner could accrue interest of $ 90,281 for 1983. B. Opinion
We must decide: (1) Whether petitioner may deduct accrued interest expense for increased income tax liability in 1982 or 1983, and (2) the proper amount of the deduction. The parties agree that under the tax benefit rule, [5] petitioner must reverse (i.e., report in income an amount equal to) its previous excise tax interest deductions. Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370, 381-383 (1983). Petitioner did so. The parties also agree that by reversing those deductions, petitioner increased its income tax liability for those years. The parties agree that petitioner accrued an obligation to pay interest on this tax liability. The parties disagree about when petitioner may deduct this interest. *262 The all events test governs whether and when an accrual basis taxpayer may deduct a business expense. Sec. 1.446-1(a)(2), (c)(1)(ii), Income Tax Regs.Deductions under the accrual method are allowable for the taxable year in which all the events have occurred which establish the fact of liability and the amount of the liability can be determined with reasonable accuracy. United States v. Hughes Properties, Inc., 476 U.S. 593, 600 (1986); sec. 1.446-1(a)(2), (c)(1)(ii), Income Tax Regs.
Petitioner included the excise tax reserve in income in 1982. Petitioner's liability for the resulting increased income tax for 1974 to 1981 became fixed in 1982. Petitioner could determine its liability as of 1982. Thus, all events determining the fact and amount of liability occurred in 1982. Respondent contends that petitioner's liability for income tax interest was not firmly established until petitioner filed the amended income tax returns in 1983. [6] We disagree. *263 The only relevant events which occurred in 1983 were petitioner's filing of various tax returns. On the amended returns, petitioner eliminated prior deductions. On its 1982 return, petitioner reported the interest expense deductions for the increased income taxes which are at issue here. The 1982 return and amended returns did not fix liability. If petitioner had not filed any of the returns in 1983, the unrefunded excise taxes would still be includable in its income in 1982 and the decreased interest expense deductions would be firmly established. The decreased deductions caused the increased income tax which in turn caused the accrued interest on income tax at issue. Similarly, petitioner would be liable for the related accrued interest expense in 1982 even if it had not filed any returns in 1983. We know of no authority, and respondent suggests none, for the proposition that petitioner is not liable for interest on income tax liability until it files a return. We conclude that petitioner may deduct the accrued interest at issue here for the same year in which it became liable for tax on the related income. Thus, petitioner may deduct $ 78,476 in 1982 when petitioner accrued *264 in income the unrefunded excise taxes. [7]
IV. Sporting Event Tickets
A. Findings of Fact
Petitioner purchased season tickets to Cincinnati Bengals football games and St. Louis Blues hockey games from 1982 to 1985. A ticket for each game cost less than $ 25. Petitioner gave tickets to customers, such as Tractor Trailer Supply and National Auto Supply and others. Stone did not attend any of the games or know who used the tickets. Petitioner deducted as advertising expenses the cost of the tickets as follows: 1982, $ 2,839; 1983, $ 2,921; 1984, $ 3,158; and 1985, $ 3,020. Respondent determined that these amounts are not deductible on the grounds that they were not ordinary and necessary business expenses and that petitioner did not meet the recordkeeping requirements of section 274. B. Opinion
1. Background
Section 162(a) authorizes deductions for ordinary *265 and necessary business expenses including advertising and promotional expenses. Section 274(d)(2) and (3) prohibits deductions for entertainment, amusement, recreation activities, or gifts, unless the taxpayer meets stringent substantiation requirements. Sporting events are entertainment for purposes of section 274. Andress v. Commissioner, 51 T.C. 863, 867 (1969), affd. 423 F.2d 679 (5th Cir. 1970). Petitioner has the burden of proving that it is entitled to the claimed deduction. Rule 142(a). Petitioner contends that the cost of these sporting event tickets is deductible on the grounds that: (1) Petitioner has met the substantiation requirements of section 274; (2) the deductions are de minimis in amount; and (3) the costs are not subject to section 274 because Stone did not attend any of the games. 2. Substantiation Requirements
Petitioner contends that it met the substantiation requirements of section 274. We disagree. Generally, a taxpayer may not deduct entertainment expenses unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement: (1) The *266 amount of the expense or other item; (2) the time and place of the entertainment, amusement, or recreation, or the date and description of the gift; (3) the business purpose of the expense or other item; and (4) the business relationship to the taxpayer of persons entertained or receiving the gift. Sec. 274(d). General testimony of business purpose, even if there is no evidence of personal, nonbusiness use, does not meet the section 274 substantiation requirements. Rutz v. Commissioner, 66 T.C. 879, 883-886 (1976). The taxpayer must substantiate each element for every item of entertainment expense. BJR Corp. v. Commissioner, 67 T.C. 111, 128 (1976). Adequate records consist of an account book, diary, statement of expense, or similar record which is sufficient to establish the expense elements. Sec. 1.274-5(c)(2)(i), Income Tax Regs.If the taxpayer attempts to substantiate a required element other than through required records, the taxpayer must establish the element by his own statement containing specific, detailed information about each element, and by other corroborative evidence sufficient to establish the *267 element. Sec. 1.274-5(c)(3), Income Tax Regs.
Petitioner argues that Stone's testimony and declaration are sufficiently corroborated by Rumpler's testimony and petitioner's records. Petitioner's documentary evidence was sparse. It consisted of two letters sending St. Louis Blues hockey tickets to Tractor Trailer Supply in 1982 and three letters sending St. Louis Blues hockey tickets to National Auto Supply and Tractor Trailer Supply in 1983. Each letter said only: "Attached are four tickets to * * * [a specific game and date]. I hope that you and whoever joins you in attending enjoy themselves." Stone testified that: (1) The tickets were a part of petitioner's promotional effort; (2) petitioner gave the tickets to employees, customers, vendors, and distributors to promote sales and maintain good customer and employee relations; and (3) petitioner kept a schedule of the teams' home games and noted on it to whom petitioner gave the tickets. This is not enough under section 274(d) because it is a general uncorroborated statement of business purpose, Rutz v. Commissioner, supra, which does not identify the business relationship to the taxpayer *268 of persons entertained or receiving the gift, sec. 274(d). Rumpler testified: It was our understanding that these tickets were given to employees, customers, suppliers. In our judgment, it was clear that, since Mr. Stone was not an individual that engaged in a lot of entertainment activity, and that it was remote that he would have used these tickets, because of his work schedule, and -- I think that was the basis.
Rumpler's knowledge of petitioner's use of the tickets was at best vague. The record does not show who received the tickets except to the extent indicated in the five letters of transmittal, when the tickets were given, or who used them. Petitioner did not provide any records other than the five letters of transmittal. For the foregoing reasons, we conclude that petitioner did not meet the substantiation requirements of section 274(d). 3. De Minimis Rule
Petitioner contends that the cost of the tickets was de minimis, and that the Secretary, contrary to congressional intent, has not issued a de minimis rule. Section 274(d) provides that "The Secretary may by regulations provide that some or all of the requirements of * * * [section 274(d)] shall not *269 apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations." Respondent has not promulgated these regulations. Issuance of any such regulations by the Secretary is discretionary because section 274(d) uses the term "may" rather than "shall". This interpretation is consistent with the legislative history, which provides: "Under the bill, the Secretary or his delegate may, by regulation, prescribe certain situations in which the substantiation requirements will not be applied." S. Rept. 1881, 87th Cong., 2d Sess. 35 (1962), 1962-3 C.B. 707, 741. We conclude that, in the absence of such a regulation, petitioner may not deduct a de minimis amount under section 274(d). 4. Whether Section 274 Applies to These Expenses
Petitioner asserts that section 274 does not apply to these tickets because Stone, petitioner's president, was not one of the persons entertained. Petitioner does not cite any authority for this view. By its terms, section 274 applies to the costs of entertainment activities paid by a corporation. Sec. 274(a)(1)(A). We reject petitioner's argument that section 274 does not apply because petitioner's *270 president did not personally participate in the activity. We conclude that petitioner is not entitled to deduct expenses for tickets to professional sports activities. V. Legal Expenses Deductions
A. Findings of Fact
1. Alsco-Harvard Litigation
In 1969 Stone and petitioner were sued for fraud in connection with Stone's operation of Chromcraft and its successor, Alsco, Inc., companies which were unrelated to petitioner. The suit was brought by shareholders of Alsco-Harvard Industries and by the United States (Alsco-Harvard litigation). The United States alleged that Stone defrauded the U.S. Navy on contracts for the manufacture and sale of rocket launchers while he was president of Chromcraft. These cases were consolidated by a U.S. District Court multidistrict panel for trial in the U.S. District Court for the District of Columbia. Stone owned 75 percent of the stock of Chromcraft and Alsco, Inc. Stone sold all of his interest in Chromcraft in 1969 and thereafter had no interest in that company. In 1969 or early 1970, Stone and the United States entered into an escrow agreement to provide security for payment of any judgments the United States might obtain *271 in the Alsco-Harvard litigation. Under the agreement, Stone gave all the stock of petitioner and more than $ 1 million in securities to an escrow agent. The escrow lasted until 1983. In 1970, the National Automotive Parts Association (NAPA) sought to increase its purchases from petitioner. To supply NAPA, petitioner would have had to expand by building a new manufacturing facility. Petitioner did not obtain financing to expand and lost the NAPA account. Sometime between 1962 and 1968, Stone was convicted of participating in a conspiracy to commit an offense or to defraud the United States and for knowingly making false, fictitious, or fraudulent statements in the criminal component of the Alsco-Harvard litigation. He was incarcerated from February 1970 to March 1974. Petitioner continued to operate while Stone was incarcerated. The law firm of Casey, Scott & Canfield represented Stone in the Alsco-Harvard litigation beginning around 1976. In 1976, petitioner was dismissed as a party to the Alsco-Harvard litigation. Stone settled with the Alsco, Inc., shareholders and Harvard Industries in 1976. The Navy contract litigation with Stone, Chromcraft and Alsco, Inc., continued. *272 In 1981, the District Court denied the Government's motion for summary judgment against Stone in the Alsco-Harvard litigation on the issue of damages. During the early 1980s, petitioner had letters of credit available for purchases from overseas. In 1981, petitioner lent about $ 600,000 in cash and a $ 200,000 note receivable to a company called King George Farm, Inc. In exchange for the loan, petitioner received a note and mortgage from Stone's two children. Before 1983, petitioner had a line of credit and available operating loans from its bank, Central Trust, which were sufficient to keep it operating. In 1983, Stone and the Government settled the Alsco-Harvard litigation. 2. Tax Cases
In 1972, respondent made a jeopardy assessment of about $ 14 million for income tax, additions to tax for fraud, and interest against Stone and his wife. As a result of the assessment, respondent attached tax liens to property of Stone and his wife. Thus, Stone could not use that property as collateral for loans. On February 29, 1980, the Chief Special Trial Judge of this Court filed a report in Stone's jeopardy assessment case, concluding that Stone had no deficiency for tax years *273 1964 to 1967 and that he was not liable for additions to tax for fraud. Saltzman, Garbis, & Schwait and Saltzman & Holloran (the Saltzman firms) represented Stone from 1982 to 1985 in District Court tax litigation relating to the jeopardy assessment. The Saltzman firms also represented Stone and his wife in a Tax Court case, docket No. 7277-78, involving tax years 1972 to 1975. Stone paid the Saltzman firms about $ 2,136.95 in 1982 $ 9,361,91 in 1983, $ 5,407 in 1984, and $ 4,156.12 in 1985. Petitioner had a prior case in this Court, docket No. 3207-72. The Saltzman firms represented petitioner in that case, the instant case, audits for later years, preparation of protests and refund claims, and other corporate tax matters from 1982 to 1985. For services rendered to it, petitioner paid the Saltzman firms about $ 14,051.97 in 1982, $ 14,797.49 in 1983, $ 42,838.57 in 1984, and $ 23,659.61 in 1985. In 1984, Saltzman & Holloran began representing Stone in his jeopardy assessment case involving tax years 1963 to 1967. Saltzman & Holloran billed petitioner for representing Stone in 1984 and the first part of 1985 in the jeopardy assessment case in the Tax Court. Petitioner paid *274 Casey, Scott & Canfield about $ 198,186 in 1982 for services rendered to Stone in the Alsco-Harvard litigation; $ 150,608.88 in 1983 for services rendered to Stone in the Alsco-Harvard litigation, Stone's tax case, and Stone's monthly retainer; and $ 23,659.61 in 1985 for services rendered to Stone in his tax case. Stone also paid that firm $ 60,000 in 1982 and 1983. In the notices of deficiency for tax years 1982 to 1985, respondent disallowed deductions for legal fees of $ 211,583 in 1982, $ 163,121 in 1983, $ 75,880 in 1984, and $ 28,439 in 1985. B. Opinion
1. Position of the Parties
Petitioner deducted its payment of Stone's legal expenses under section 162. Petitioner acknowledges that the legal fees at issue here were paid for services rendered to Stone, and that the services were not in connection with Stone's capacity as president of petitioner. Petitioner argues that it paid the legal fees to protect or promote its business and that the payment of the expenses was "directly connected with" petitioner's business for the reasons described below. [8] Respondent contends that the expenses were not ordinary and necessary expenses of petitioner. *275 2. Background
Section 162(a) authorizes taxpayers to deduct ordinary and necessary business expenses including legal fees. Generally, the payment of another taxpayer's expenses is not deductible as business expenses. Welch v. Helvering, 290 U.S. 111, 114 (1933); Lohrke v. Commissioner, 48 T.C. 679, 684 (1967). Thus, legal fees paid for services rendered to another are generally not deductible by the payor as business expenses. J. Gordon Turnbull, Inc. v. Commissioner, 41 T.C. 358, 378 (1963), affd. 373 F.2d 87 (5th Cir. 1967); Royal Cotton Mill Co. v. Commissioner, 29 T.C. 761, 788 (1958); Mann v. Commissioner, 33 B.T.A. 281, 290 (1935). However, payment of legal fees for services rendered to another are deductible if the taxpayer pays the expenses to protect or promote its own trade or business. Commissioner v. Tellier, 383 U.S. 687 (1966) (a corporation may deduct payment of legal fees for another entity when pending litigation threatens its existence); Commissioner v. Heininger, 320 U.S. 467, 475 (1943); *276 Gould v. Commissioner, 64 T.C. 132, 134-135 (1975); Lohrke v. Commissioner, supra at 684-685; Pepper v. Commissioner, 36 T.C. 886, 895 (1961); Catholic News Publishing Co. v. Commissioner, 10 T.C. 73, 77 (1948). It is not ordinary and necessary for a taxpayer corporation to pay a shareholder's legal fees when any adverse effect on the taxpayer from the lawsuit is speculative. Mann v. Commissioner, 33 B.T.A. 281, 290 (1935) (Court disallowed corporate taxpayer's deduction for legal fees connected with its president's divorce where the president's wife might exercise her right as a stockholder and engage in corporate management to the detriment of the taxpayer's business). Whether an expenditure is ordinary and necessary is usually a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). The principal issue is whether the services benefited the corporate taxpayer or the individual stockholder. Royal Cotton Mill Co. v. Commissioner, supra at 788. *277 In Lohrke v. Commissioner, supra at 688, we said: The tests as established by all of these cases are that we must first ascertain the purpose or motive which cause the taxpayer to pay the obligations of the other person. Once we have identified that motive, we must then judge whether it is an ordinary and necessary expense of the * * * [taxpayer's] trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the * * * [taxpayer] paying it.
Thus, in deciding the deductibility of payments by one taxpayer of another person's expenses, we must ascertain the purpose or motive which caused the taxpayer to pay those expenses, and decide whether the expenses are an ordinary and necessary expense of the taxpayer's business; that is, whether they are appropriate expenses to further or promote that trade or business. Lohrke v. Commissioner, supra.Petitioner bears the burden of proving that it is entitled to a deduction under this test. Rule 142(a). We conclude that petitioner has not done so. 3. Whether Payment *278 by Petitioner of Stone's Legal Expenses Was a Business Expense
Petitioner asserts that it paid Stone's legal expenses to protect its business reputation and its ability to obtain long-term financing. We disagree for the reasons stated below. Petitioner argues that if the Alsco-Harvard litigation were decided against Stone, others would believe Stone committed fraud, which would hurt Stone's business reputation and, as a result, be adverse to petitioner. We are not persuaded by this argument. Petitioner has not shown that the Alsco-Harvard litigation would cause any damage to its business reputation. We believe that Stone's criminal conviction and incarceration were adverse to Stone's business reputation and a later adverse decision in the related civil case would do much less further harm to him personally. We are not convinced that further damage to Stone would hurt petitioner. Petitioner argues that damage to Stone is damage to petitioner because Stone is indispensable to petitioner. We disagree. Petitioner would not have been able to operate during the period that Stone was incarcerated in the mid-1970s if Stone were indispensable to petitioner's business. There is *279 no evidence that petitioner suffered any decline during that period. Thus, we do not conclude that Stone was indispensable to petitioner. Petitioner alleges that it paid Stone's attorney's fees to protect its ability to obtain long-term financing. Petitioner argues this is so because Stone had placed its stock and more than $ 1 million in escrow. There is no evidence that petitioner needed long-term loans to expand its business from 1982 to 1985, the years respondent disallowed petitioner's deductions for payment of Stone's legal expenses. Petitioner apparently had available funds from 1982 to 1985. In the early 1980s, petitioner had available funds from its bank, Central Trust. In addition, it lent another entity $ 800,000 in the early 1980s. Petitioner has not convinced us that it needed Stone's personal assets to do business in those years. Petitioner argues that the loss of the NAPA account in 1970 gave it reason to be concerned that the impairment of Stone's stock would hurt the company. The NAPA opportunity occurred many years before the years in issue. There is no evidence that petitioner had or would have had a similar opportunity from 1982 to 1985. The escrow *280 lasted until 1983. This shows that petitioner was able to operate from 1970 to 1983 while its stock was tied up in escrow. Similarly, there is no evidence that the jeopardy assessment and liens prevented petitioner from operating during the time they were in effect. Petitioner's argument that the jeopardy assessment litigation eliminated one of petitioner's sources of collateral is unconvincing. Petitioner's need for Stone's personal assets to do business during 1982 to 1985 is speculative. We conclude that petitioner did not pay Stone's attorney's fees in 1982 to 1985 to protect its business interests. Petitioner argues that its payment of Stone's legal fees was an ordinary and necessary business expense for the same reasons discussed above. Petitioner contends that it needed to protect its business reputation and ability to obtain financing. As discussed above, we reject those contentions. Thus, we are not convinced that the legal expenses were an ordinary and necessary expense of petitioner. Petitioner relies on Pepper v. Commissioner, supra (taxpayer located creditors for a client, and paid those creditors to compensate them for damages *281 after discovering a fraud on the creditors by the taxpayer's client); Lohrke v. Commissioner, supra (taxpayer in the business of licensing a synthetic fiber processing patent paid damages to the recipient of damaged fiber even though it was manufactured and shipped by another corporation); and Catholic News Publishing Co. v. Commissioner, 10 T.C. 73, 77 (1948) (corporate taxpayer directed its president to settle claim against him that was having adverse effect upon its business; taxpayer allowed to deduct amount it paid to president to reimburse him for cost of settlement). Those cases are distinguishable from the instant case because there was a clear, direct, and proximate adverse effect on the taxpayer's business in those cases that is absent in the instant case. Here, the legal services were for Stone, individually. We conclude that petitioner may not deduct its payments of legal fees for services rendered to Stone in connection with either the Alsco-Harvard litigation or Stone's personal taxes. VI. Accrual of UAWPension Liability
A. Findings of Fact
1. Background
Petitioner had a pension *282 plan agreement with Local 1258 of the United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) beginning in 1956. The plan was funded by contributions from petitioner. Petitioner terminated the plan on April 5, 1975, after a strike by its UAW employees. 2. First PBGC Action
In 1976, petitioner sought a declaratory judgment against the Pension Benefit Guarantee Corp. (PBGC) in the U.S. District Court for the Southern District of Ohio (District Court) (first PBGC action). Petitioner contended that the plan was exempt from the plan termination insurance program established by title IV of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, 1003, 29 U.S.C. secs. 1321(b) (1) and (5), 1322, 1342(d)(1)(B). If the plan were covered by the plan termination insurance program, the PBGC would have been liable to plan participants to the extent that the plan was underfunded, and the PBGC could sue petitioner for limited reimbursement. [9]
*283 In 1978, the District Court granted the declaratory judgment in the first PBGC action. The court held that the plan was exempt from the plan termination insurance program under ERISA section 4021(b)(5). The PBGC appealed. On May 6, 1981, the U.S. Court of Appeals for the Sixth Circuit reversed the District Court's decision and remanded. The court did not state that petitioner was liable to the PBGC, but did hold that petitioner is not exempt under 29 U.S.C. sec. 1321(b)(5) and that title IV of ERISA was constitutional. Concord Control, Inc. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers, 647 F.2d 701, 703-705 (6th Cir. 1981). Petitioner petitioned the U.S. Supreme Court for a writ of certiorari in the first PBGC action. The Supreme Court denied the petition on November 16, 1981. The record does not include an opinion of the District Court on remand, and we are not aware of any reported case pursuant to the remand. 3. Second PBGC Action
In 1981, the PBGC sued petitioner in the District Court (second PBGC action) to collect petitioner's pension plan liability *284 under 29 U.S.C. sections 1362 and 1368(d). In that case petitioner contested both the PBGC's right to recover and the amount of recovery. Pension Benefit Guaranty Corp. v. Concord Control Inc., C-1-81-348 (S.D.Ohio, Jan. 10, 1984) (slip op. at 7). Petitioner argued that the court lacked jurisdiction over the case because it was filed without a prior nonjudicial request or demand for payment and before there was any neglect or refusal to pay. Petitioner also argued that the statute of limitations barred collection, challenged the amount claimed by the PBGC, and argued that the PBGC should not be awarded prejudgment interest. The PBGC initially claimed that petitioner's liability was $ 830,162. By 1982, the PBGC reduced its claim to $ 669,296. Petitioner asked the law firm of Bryan, Cave, McPheeters & McRoberts (Bryan, Cave), petitioner's counsel in the second PBGC action, to estimate the amount which might ultimately be due on the PBGC's claim. By letter to petitioner dated December 17, 1982, Bryan, Cave estimated petitioner's pension plan liability to be at least $ 516,300. The letter states in part: The Corporation has raised a *285 defense that, if sustained, would preclude any recovery by the PBGC. However, if that defense is unsuccessful, the Corporation will definitely be liable for no less than $ 516,300. When this action was filed, the PBGC claimed that the present value of the guaranteed but unfunded benefits was $ 830,162. As a result of discovery and pretrial preparation, the PBGC has reduced its claim to $ 669,296. The Corporation is still challenging certain aspects of the PBGC's valuation method. If the Corporation's contentions with respect to computation were sustained, the effect would be to reduce the liability to $ 516,300.
The letter also said that petitioner might be liable for prejudgment interest which would increase petitioner's total liability to at least $ 660,000. Under ERISA, the liability of an employer (petitioner) was limited to the lesser of: (1) The current value of the plan's benefits ($ 530,000) over the current value of the plan's assets allocable to those benefits when the plan terminated, or (2) 30 percent of the net worth of the employer (petitioner). 29 U.S.C. sec. 1362(b) (1976). [10] There is no indication that Bryan, Cave *286 considered the 30-percent limit. On the 1982 return, petitioner accrued a deduction of about $ 510,555 for its estimated liability to the PBGC and $ 146,300 for interest attributable to the liability. In August 1983, the PBGC and petitioner stipulated the amount of the ERISA plan funding insufficiency, which was one of the elements necessary to calculate petitioner's *287 liability to the PBGC if petitioner were liable. On January 10, 1984, the District Court filed its opinion. The Court said the issues to be decided were: (1) What was the "net worth" of defendant Concord on April 1, 1975? (2) Is a demand for payment a jurisdictional prerequisite to maintaining a suit to collect pension plan liability pursuant to 29 U.S.C. § 1362? (3) Is PBGC entitled to interest on the amount of liability due under § 1362 and if so, at what rate?
Pension Benefit Guaranty Corp. v. Concord Control Inc., supra (slip op. at 1-2). The District Court stated the following conclusions of law: (1) This Court has jurisdiction pursuant to 29 U.S.C. §§ 1303(e), 1362, 1368. (2) Thirty percent (30%) of the net worth of defendant Concord Control, Inc. on April 1, 1975 is $ 243,676.80. (3) An actual demand by PBGC on the employer is needed prior to the filing of a Complaint in order to satisfy the "demand" requirement in 29 U.S.C. § 1368(a). (4) Although the statutory prerequisite of "demand" was not asserted within the six-year period *288 to create a lien under § 1368(a), PBGC may alternatively sue to collect the liability imposed by § 1362 and the Court has jurisdiction to address such a case under 29 U.S.C. §§ 1303(e) and 1368(d) (2). (5) The PBGC is awarded interest on Concord's post plan-termination liability of $ 243,676.80 from April 2, 1981 until payment is made in full. 29 U.S.C. §§ 1362, 1368. Because PBGC is pursuing only simple interest on the fund, (Def's. Post-trial Brief at 3, n.3), the rate of interest mandated by 26 U.S.C. § 6621 shall be so limited.
Pension Benefit Guaranty Corp. v. Concord Control Inc., supra (slip op. at 19). In January 1984, petitioner reduced its estimate of the PBGC accrual for 1983 by $ 300,000 and increased its 1983 income by $ 300,000. Petitioner paid the judgment of $ 243,676.80 on January 31, 1984, and interest on the judgment of $ 118,607.44 on February 2, 1984. On its 1984 income tax return, petitioner deducted $ 5,529, which was the excess of the amount paid over the amount previously accrued. Respondent determined that petitioner was not *289 entitled to accrue for 1982 any part of the approximately $ 510,555 for pension plan expenses or $ 146,300 for related interest expense. B. Opinion
1. Background
Petitioner contends that it may deduct, for 1982, its liability to the PBGC due to its underfunded UAW pension plan because it satisfied the all events test under sections 1.461-1(a) (2) and 1.446-1(c)(1)(ii), Income Tax Regs.
Petitioner computes taxable income using the accrual method. Sec. 446(c)(2). Deductions under the accrual method are allowable for the taxable year in which all the events have occurred which establish the fact of the liability and the amount of the liability can be determined with reasonable accuracy. United States v. Hughes Properties, Inc., 476 U.S. 593, 600 (1986); secs. 1.461-1(a)(2), 1.446-1(c)(1)(ii), Income Tax Regs. The Supreme Court has stated:
It is fundamental to the "all events" test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established. * * * Nor may a taxpayer deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events *290 that have not occurred by the close of the taxable year. [Citations omitted.]
United States v. General Dynamics Corp., 481 U.S. 239, 243-244 (1987). Accrual of the contested portion of the deductions in years during which the contest is ongoing is generally improper. Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 284 (1944); Dixie Pine Prods. Co. v. Commissioner, 320 U.S. 516, 519 (1944); cf. sec. 461(f). 2. Whether the Fact of Petitioner's PBGC Liability Was Established in 1982
Petitioner argues that the first element of the all events test is satisfied because the fact of its liability to the PBGC was established when the Supreme Court denied certiorari in the first PBGC action in 1981. We disagree. The first PBGC action did not establish the fact of petitioner's liability to the PBGC. Rather, it established that petitioner was not exempt from the plan termination insurance program under ERISA section 4021(b) (5). The first PBGC action established that title IV of ERISA applied to petitioner's plan. This gave the PBGC the right to sue petitioner for limited *291 reimbursement. The PBGC sued for reimbursement in the second PBGC action. Petitioner defended against the PBGC's claim and contested the fact of liability by arguing that the PBGC claim was invalid on the grounds that a demand is a jurisdictional prerequisite, the court lacked jurisdiction, and the statute of limitations barred recovery. [11] Thus, petitioner contested its liability to the PBGC in the second PBGC action. The District Court, however, decided that petitioner was liable to the PBGC and the amount of liability. Pension Benefit Guaranty Corp. v. Concord Control Inc., supra (slip op. at 10). For the foregoing reasons, we conclude that petitioner has not established that it was liable to the PBGC in 1982. *292 3. Whether the Amount of Liability Could Be Determined With Reasonable Accuracy
Petitioner contends that the amount of liability to the PBGC could and was determined with reasonable accuracy in the Bryan, Cave letter. Even if petitioner were liable to the PBGC in 1982, we are not convinced that petitioner was able to determine the amount of its liability with reasonable accuracy in 1982 as required by the second prong of the all events test. Willamette Indus. Inc. v. Commissioner, 92 T.C. 1116, 1121 (1989); secs. 1.461-1(a)(2), 1.445-1(c)(1)(ii), Income Tax Regs. Bryan, Cave apparently did not consider petitioner's net worth in estimating petitioner's PBGC liability, and thus ignored the fact that petitioner's liability to the PBGC would be limited to 30 percent of petitioner's net worth as was found by the District Court. 29 U.S.C. sec. 1362(b); Pension Benefit Guaranty Corp. v. Concord Control Inc., supra (slip op. at 19). If the Bryan, Cave attorney did not consider net worth, then he did not make an estimate with reasonable accuracy. Petitioner argues that the estimate was sufficient because, *293 petitioner contends, it was based on the best information available. Petitioner relies on Chicago, B. & O. R.R. v. United States, 197 Ct. Cl. 264, 455 F.2d 993, 1019 (1972), revd. on another issue 412 U.S. 401 (1973), which did not involve a contested liability. Petitioner argues that the fact that the amount was revised in 1984 is not fatal because respondent's regulations allow for adjustment in a later year. Sec. 1.461-1(a) (2), Income Tax Regs. We agree. However, our decision is not based on the fact that petitioner made an adjustment in 1984, but on the fact that petitioner was contesting the fact and the amount of liability in 1982. We conclude that petitioner may not deduct any part of the approximately $ 510,555 as UAW pension expenses or $ 146,300 as interest in 1982. Rather, we hold that petitioner may deduct, for 1984, $ 243,677 in UAW pension expenses and $ 118,607 in interest. [12]
*294 VII. Sprinkler System Pump Housing
A. Findings of Fact
Petitioner's factory and offices in Cincinnati were equipped with a sprinkler system which met applicable building code requirements. In 1982, petitioner's insurer told petitioner that it would increase the premium for fire insurance or cancel the policy unless petitioner increased the water pressure delivered by the sprinkler system. The insurance carrier said that the sprinkler system must be upgraded because petitioner was working more with plastics than with metals. As a result, petitioner spent $ 42,885 to install a new water pump and housing to increase the water pressure. The new water pump and housing had a useful life of more than 1 year. The sprinkler system passed the insurance carrier's periodic safety inspections before 1982 and was not broken or defective when petitioner installed the new water pump and housing. Petitioner deducted the $ 42,885 cost of the water pump and housing as a sprinkler system expense on its 1983 tax return. In the notice of deficiency for 1983, respondent determined that petitioner should capitalize the cost of the pump and housing. B. Opinion
Petitioner argues *295 that the cost of the water pump and housing is deductible as preventive maintenance under section 162. Respondent contends that it is a capital expenditure under section 263. A repair is an expenditure which keeps property in an ordinarily efficient operating condition and which does not materially increase the value of the property or appreciably prolong its life; expenditures for repairs are distinguishable from replacements, which appreciably prolong the life of the property, increase its value, or make it adaptable to a different use. Oberman Manufacturing Co. v. Commissioner, 47 T.C. 471, 483 (1967); Illinois Merchants Trust Co. v. Commissioner, 4 B.T.A. 103, 106 (1926); see sec. 1.162-4, Income Tax Regs.
The upgraded sprinkler pump and housing increased the capacity and value of the system. Before petitioner upgraded its sprinkler system, petitioner could use its building only to manufacture metal products unless it paid an increased premium for fire insurance. After upgrading the system, petitioner could manufacture plastic as well as metal products without paying an increased fire insurance premium. We infer *296 that this appreciably increased the value and prolonged the life of the building in petitioner's business. Petitioner points out that Rumpler testified that the new pump and housing did not enhance the value or extend the life of the building. Rumpler said: "In our judgment, it didn't enhance the value [or] * * * extend the life of the building. It simply allowed the company to operate. The company operated after the expenditure the way they did before." We give little weight to Rumpler's opinion because his conclusion had no foundation or explanation, and he apparently did not take into account the fact that, in the opinion of petitioner's fire insurer, the improvements were needed. [13]
Petitioner argues that the cost of the new pump and housing is deductible as preventive maintenance *297 because the increased water pressure helps to ensure that the plant will remain operational if there is a fire. Petitioner cites several cases to support its position. However, the expenditures in those cases did not materially increase the value of the property or permit a change in its use. Many of the cases cited by petitioner allowed expenses to be deducted when necessitated by casualties or other sudden events as distinguished from normal exhaustion or obsolescence. Hotel Sulgrave, Inc. v. Commissioner, 21 T.C. 619 (1954), reflects that this distinction has not been extended to an improvement (installation of a sprinkler system) required by the local building code. Similarly, in the instant case, petitioner upgraded the sprinkler system to satisfy the fire insurance company. Petitioner relies on three cases which held that expenses of repairing damages were deductible: Southern Ford Tractor Corp v. Commissioner, 29 T.C. 833 (1958) (unblocking of a previously free-flowing drainage ditch); American Bemberg Corp. v. Commissioner, 10 T.C. 361 (1948) (repairs to a factory after a cave-in), *298 affd. 177 F.2d 200 (6th Cir. 1949); and Ohio-Kentucky Loose Leaf Tobacco Warehouse Co. v. Commissioner, a Memorandum Opinion of this Court dated Jan. 8, 1951 (temporary roof repairs). Petitioner also relies on Midland Empire Packing Co. v. Commissioner, 14 T.C. 635 (1950). In that case, the taxpayer, a meatpacker, lined the walls and floor of its basement with concrete to protect against imminent damage from oil seeping from a nearby refinery. We held that the expenditure for the concrete was ordinary and necessary. Unlike the instant case, the expenditures in those cases did not appreciably increase the life or value of the property or permit a change in its use. Petitioner also relies on cases where the corrective measures were temporary, such as Plainfield-Union Water Co. v. Commissioner, 39 T.C. 333 (1962) (temporary lining of pipes with concrete to protect against acid water). Those cases are consistent with our holding here because they involved repairs that did not materially enhance the property's value, appreciably increase the property's life, or allow a change of use. Petitioner's *299 reliance on Scott v. Commissioner, T.C. Memo. 1979-29 (lawn sprinklers installed to prevent further cracking of foundation) is similarly misplaced because the lawn sprinkler in that case did not appreciably increase the life or value of the apartment, or make it adaptable to a different use. The upgraded pump and housing in the instant case were improvements which, in the view of petitioner's insurer, were required to adapt petitioner's factory to the use of plastics. This expenditure to accommodate changing use of the facilities is not a repair or preventive maintenance. We conclude that the cost of the sprinkler pump and housing improvement is a capital expenditure. VIII. Fire Loss Deduction
A. Findings of Fact
A fire damaged petitioner's factory on May 9, 1984. At that time, petitioner had an insurance policy with Industrial Risk Insurers (IRI) which insured petitioner's factory against loss from fire and other perils. The policy had a face amount of $ 14,458,000 and a deductible of $ 1,000. Petitioner spent $ 352,000 in 1984 to repair the fire damage. In June 1984, petitioner filed a notarized "Partial Payment Sworn Statement *300 In Proof Of Loss" (preliminary claim) of $ 140,000 with IRI for partial payment of the fire loss. IRI paid that claim in full in 1984. [14]
On August 27, 1984, petitioner's controller telephoned IRI and requested a second partial payment (oral request). The oral request included expenses for administrative and handling fees, internal labor costs, and overhead rates. IRI did not reject the oral request. Instead, IRI asked petitioner to provide more information before acting on the oral request. IRI made various estimates based on petitioner's oral request as IRI learned more about the case. As of November 27, 1984, petitioner had not provided some of the information IRI had requested. IRI neither approved nor denied *301 the oral request by the end of 1985. Petitioner tried to persuade IRI to pay the amounts claimed in the oral request from 1984 until 1986. On February 11, 1986, petitioner filed a notarized "Sworn Statement In Proof Of Loss, Property Damage Only, 2nd & Final Payment" (final claim) in which petitioner claimed that the entire damage was $ 304,478.05. The final claim was for $ 164,478.05 ($ 304,478.05 - $ 140,000 = $ 164,478.05). IRI paid $ 164,478.05 in 1986. Petitioner deducted $ 211,962.40 for 1984 and $ 31,112.21 for 1985 for unreimbursed fire losses. Petitioner reported the $ 164,478.05 payment on its 1986 tax return. In the notice of deficiency for 1984 and 1985, respondent disallowed the deductions for fire loss in the amounts of $ 211,963 for 1984 and $ 31,112 for 1985. B. Opinion
We must decide whether petitioner may deduct losses in 1984 and 1985 from the fire. A taxpayer may deduct losses sustained during the taxable year which are not compensated by insurance or otherwise. Sec. 165(a). If a casualty occurs which results in a loss and there is a reasonable prospect for reimbursement for a portion of the loss, then that portion of the loss cannot be deducted *302 until it can be ascertained with reasonable certainty whether or not the reimbursement will be received. Sec. 1.165-1(d)(2)(i), Income Tax Regs. Petitioner argues that it could be ascertained with reasonable certainty that IRI would deny reimbursement for the oral request in 1984 and 1985. We disagree. Whether petitioner may deduct the loss in 1984 must be decided based on the facts existing at the end of that year. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811-812 (1974), affd. 521 F.2d 786 (4th Cir. 1975). In 1984, petitioner orally asked IRI to pay a part of what it claimed for the total reimbursement due under the policy. It appears that IRI was prepared to act on petitioner's oral request as soon as petitioner provided cost data to support the claims. Petitioner argues that it did not have a reasonable prospect of recovery because the insurer had some doubt about petitioner's claim. Petitioner did not introduce any evidence from IRI that IRI expressed doubt. IRI merely asked petitioner to provide cost figures. We do not view that as doubt about the validity of the claim. Petitioner relies on Miller v. Commissioner, 733 F.2d 399 (6th Cir. 1984), *303 affg. T.C. Memo. 1981-431, and Hills v. Commissioner, 76 T.C. 484 (1981), affd. 691 F.2d 997 (11th Cir. 1982). The taxpayers in those cases were allowed to deduct losses after they decided not to file claims for reimbursement under their insurance policies. These cases do not assist petitioner because it was pursuing a claim against IRI and IRI was considering the claim. Petitioner has not convinced us that there was no reasonable prospect of recovery. We conclude that petitioner has failed to prove that it is entitled to the fire loss deductions for 1984 and 1985. IX. Bates Litigation (Section 461(f))
A. Findings of Fact
Before 1985, one of petitioner's customers, Bates Industries (Bates), sued petitioner in California State court and claimed damages (Bates litigation). The trial court entered a $ 201,810 judgment against petitioner in 1985. Petitioner appealed the judgment. Petitioner obtained a letter of credit from Central Trust. Petitioner's letter of credit agreement provided in part: Customer [petitioner] grants Central Trust a security interest or mortgage in all *304 personal or real property now owned or hereafter acquired of Customer that is or may come into Central Trust's possession or control in whatever manner, including but not limited to, all deposit accounts, certificates of deposit and any other real or personal property pledged or mortgaged to Central Trust or in which Central Trust is granted a security interest ("Collateral") to secure all of its obligations under this Agreement.
Central Trust issued a $ 303,000 letter of credit naming Travelers Indemnity Co. (Travelers) as beneficiary. Travelers issued an appeal bond on petitioner's behalf in the Bates litigation. Petitioner obtained the appeal bond and letter of credit so that it could appeal the lower court's judgment and provide security for Travelers. Petitioner accrued a $ 201,810 deduction, the amount of the judgment in the Bates litigation, on its 1985 tax return. On its 1987 tax return, petitioner accrued a $ 52,000 deduction for interest payable on the Bates judgment. In the notice of deficiency for tax year 1985, respondent disallowed the $ 201,810 litigation loss claimed in the Bates litigation. In the notice of deficiency for 1987, respondent disallowed a $ *305 52,000 interest deduction accrued on the Bates litigation loss. The appellate court affirmed the judgment in 1989 in favor of Bates. Petitioner paid the judgment plus interest in 1989. B. Opinion
Generally, an accrual basis taxpayer may accrue a deduction for an expense only in the taxable year in which all events have occurred that determine the fact of the liability and the amount can be determined with reasonable accuracy. Willamette Indus. Inc. v. Commissioner, 92 T.C. 1116, 1121 (1989); sec. 1.446-1(a)(2), (c)(1)(ii), Income Tax Regs.
In 1961, the Supreme Court held that if liability is contingent on the outcome of a contested lawsuit, neither the fact nor amount of the expense is reasonably ascertainable; as a result, the expense is generally not deductible. United States v. Consolidated Edison Co., 366 U.S. 380, 385-386 (1961). In 1964, Congress enacted section 461(f). Revenue Act of 1964, Pub. L. 88-272, sec. 223(a)(1), 78 Stat. 19, 76. Generally, section 461(f) permits cash and accrual taxpayers to deduct a contested liability if the taxpayer makes a transfer in that tax year to satisfy the contested *306 liability. Section 461(f) was enacted because Congress had concluded that it was "unfortunate to deny taxpayers a deduction with respect to an item where the payment has actually been made, even though the liability is still being contested either as to amount or as to the item itself." S. Rept. 830, 88th Cong., 2d Sess. 100 (1964), 1964-1 C.B. (Part 2) 505, 604. Under section 461(f), a taxpayer may deduct an amount transferred to satisfy a contested liability in the tax year of the transfer if it meets four conditions: (1) The taxpayer contests an asserted liability; (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability; (3) the contest with respect to the asserted liability exists after the transfer; and (4) but for the fact that liability is contested, a deduction would be allowed for the taxable year of the transfer (or an earlier taxable year). Respondent contends petitioner failed to meet the second requirement (transfer requirement). Section 1.461-2(c) (1), Income Tax Regs., [15] describes the transfer requirement as follows: (c) Transfer to provide for the satisfaction of an asserted *307 liability -- (1) In general. A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control * * * to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest * * * Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.
The regulation requires that money or property must be transferred beyond the control of the taxpayer, *308 and that the taxpayer must relinquish all authority over it. Chem Aero, Inc. v. United States, 694 F.2d 196, 198 (9th Cir. 1982); Davies v. Commissioner, 101 T.C. 282, 288 (1993). The security interest provided in petitioner's letter of credit agreement is contingent on acquisition of possession or control of some of petitioner's property by Central Trust. There is no evidence in the record that Central Trust possessed or controlled any of petitioner's property or that petitioner transferred, pledged, or mortgaged any money or property to Central Trust. Therefore, petitioner did not meet the transfer requirement. We reached a similar conclusion in Willamette Indus. Inc. v. Commissioner, 92 T.C. 1116 (1989). In Willamette Industries the taxpayer was an accrual method corporation. It placed a $ 20 million letter of credit in trust to satisfy the estimated claims of a contested liability. The taxpayer agreed to repay the bank within 90 days after drawing on the letter of credit, with interest at 103 percent of the prime rate. The taxpayer paid the bank about $ 85,000 for the letter *309 of credit and trustee fees. The taxpayer deducted $ 20 million under section 461(f). We described the letter of credit as follows: When a bank issues a letter of credit, the bank commits to provide funds when and if certain specified events occur. See Chase Manhattan Bank v. Equibank, 550 F.2d 882, 885 (3d Cir. 1977); Chapman v. United States, 527 F. Supp. 1053 (D. Minn. 1981). It is not a loan, but rather a commitment to make a loan. Until the specified events occur, no money is transferred. * * *
Id. at 1124. We held that the letter of credit did not satisfy the transfer requirement of section 461(f) because the taxpayer exchanged a contingent liability to the plaintiffs in exchange for a contingent liability to the bank. Id. at 1125. Here, petitioner also exchanged a contingent liability to Bates in exchange for a contingent liability to Central Trust. Petitioner relies on Chem Aero, Inc. v. United States, supra. The taxpayer in that case appealed a $ 54,082 judgment and posted an $ 80,900 appeal bond. *310 The appeal bond was collateralized with an irrevocable letter of credit in 1975. The taxpayer pledged a $ 100,000 certificate of deposit to secure the letter of credit.[16] The certificate of deposit was later used to pay the liability. The taxpayer contended it could deduct $ 54,082 in 1975. The Court of Appeals for the Ninth Circuit held that the taxpayer irrevocably transferred the certificate of deposit and that the deduction was allowable under section 461(f). Id. at 200. Petitioner contends that it met the transfer requirement of section 461(f)(2) when it obtained a bond secured by a standby letter of credit. Petitioner argues that this case is like Chem Aero, Inc. v. United States, supra, because under the collateral agreement in the instant case, petitioner gave a security interest in all of its property, including after acquired property. We disagree, because, as *311 stated above, petitioner has not shown that any of its property came into Central Trust's possession or control. Thus, we conclude that the holding in Chem Aero does not support petitioner's position here. We conclude that petitioner has not met the transfer requirement of section 461(f)(2), and may not deduct the $ 201,810 litigation loss in 1985 or $ 52,000 for interest accrued on the Bates litigation loss in 1987. [17]
X. Malpractice Insurance Recovery
A. Findings of Fact
In Concord Control, Inc. v. Commissioner, 78 T.C. 742 (1982), we held that petitioner's predecessor acquired $ 334,985 of nondepreciable going-concern value when it bought petitioner in 1964. We held that petitioner's predecessor had to reduce the basis of depreciable property and the amount of depreciation taken for 1964, 1965, and 1966. The effect of *312 our decision was to increase petitioner's predecessor's income tax liability by $ 160,020 for those years. Petitioner had the right to appeal that decision, but failed to timely file a notice of appeal. After our decision became final, petitioner paid respondent $ 666,230, of which $ 248,864 was for the total deficiency and $ 417,366 was for accrued interest. Petitioner made a claim against its counsel's professional liability insurance company, American Home Insurance Co. (American Home), because of the failure to file a timely appeal. Petitioner claimed $ 466,034, consisting of $ 160,020 in deficiency and $ 265,012 in interest to respondent and $ 41,002 in interest to a bank. American Home asked petitioner's counsel for the arguments petitioner would have made in an appeal. Petitioner's counsel provided those arguments and American Home reviewed them. In May 1985, American Home paid $ 125,000 to petitioner in full settlement of the claim. Petitioner treated the payment as nontaxable and did not report it as income. Respondent determined that the insurance payment was taxable income to petitioner. B. Opinion
Petitioner contends its counsel's failure to appeal our *313 decision caused petitioner to suffer a loss like that in Clark v. Commissioner, 40 B.T.A. 333 (1939) (payment from tax adviser to taxpayer to compensate for error on return not taxable). Respondent argues that this payment is income to petitioner because petitioner's counsel's conduct did not cause petitioner to owe additional tax. 1. Background
Generally, gross income includes all income from whatever source derived. Sec. 61. However, recovery of capital is not income. United States v. Safety Car Heating Co., 297 U.S. 88, 98 (1936); Durkee v. Commissioner, 162 F.2d 184, 185-186 (6th Cir. 1947), remanding 6 T.C. 773 (1946); Swastika Oil & Gas Co. v. Commissioner, 123 F.2d 382, 384 (6th Cir. 1941); Farmers' & Merchants' Bank v. Commissioner, 59 F.2d 912, 913 (6th Cir. 1932); Clark v. Commissioner, supra at 335; Martin Bros. Box Co. v. Commissioner, a Memorandum Opinion of this Court dated Apr. 22, 1943, affd. without opinion 142 F.2d 457 (6th Cir. 1944). *314 If a taxpayer receives damages which represent a replacement of capital destroyed or injured, the money received, to the extent it does not exceed the basis, is a return of capital and not taxable. United States v. Safety Car Heating Co., supra at 98; Phoenix Coal Co. v. Commissioner, 231 F.2d 420 (2d Cir. 1956); Durkee v. Commissioner, supra; Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110 (1st Cir. 1944), affg. 1 T.C. 952 (1943); Swastika Oil and Gas Co. v. Commissioner; supra at 384. Thus, we must decide whether the malpractice settlement was to replace damaged capital. The tax consequences of an award for damages depend on the nature of the litigation and on the origin and character of the claims adjudicated, but not the validity of such claims. Woodward v. Commissioner, 397 U.S. 572, 577-579 (1970); United States v. Gilmore, 372 U.S. 39 (1963). The proper inquiry is: in lieu of what were the damages paid? Wolfson v. Commissioner, 651 F.2d 1228 (6th Cir. 1981), *315 affg. and remanding T.C. Memo. 1978-445; Robinson v. Commissioner, 102 T.C.     (1994); Yates Indus. Inc. v. Commissioner, 58 T.C. 961, 972 (1972), affd. without published opinion 480 F.2d 920 (3d Cir. 1973). The United States Court of Appeals for the Sixth Circuit has stated the test for whether amounts received as a result of a controversy are recovery of capital as follows: "'The fund involved must be considered in the light of the claim from which it was realized and which is reflected in the petition filed.'" Durkee v. Commissioner, supra at 186 (quoting Farmers' & Merchants' Bank v. Commissioner, supra at 513); Swastika Oil & Gas v. Commissioner, supra. Thus, we look to petitioner's claim to decide whether the amounts are recovery of capital. Petitioner claimed that its counsel's error caused it to pay more taxes than it should have and that it incurred interest expenses to pay those taxes, all because of its counsel's error. Petitioner's insurance claim was not for lost profits. Petitioner paid the tax *316 deficiency from its capital funds and borrowed funds. Petitioner sought to have its capital and interest costs restored. American Home evaluated petitioner's claim, and paid petitioner $ 125,000. Recovery of capital includes amounts paid to a taxpayer to compensate for a loss suffered because of erroneous advice from his tax counsel. Clark v. Commissioner, supra.[18] *317 In Clark an attorney who prepared the taxpayer's income tax return made an error which caused the taxpayer to pay more taxes than required. The attorney reimbursed the taxpayer for the increased tax. The Board of Tax Appeals held that the reimbursement was not includable in gross income because it was compensation for a loss which impaired the taxpayer's capital. Id. at 335; [19] see Cox v. Kraemer, 88 F. Supp. 835, 837-838 (D. Conn. 1948) (taxpayer could exclude reimbursement by State legislative body to an employee for his legal expenses in successfully defending against an unjustified charge of official misconduct because it restored the taxpayer's impaired capital).
*318 Clark v. Commissioner, 40 B.T.A. 333 (1939), is instructive in deciding this case, and is closer to this situation than any other decided case either party has cited. We recognize that in Clark, unlike the instant case, there was no dispute that Clark was injured by his counsel's error, and that the amount of the injury was known. In contrast here, there is no certainty whether, or by how much, petitioner was injured by its counsel's conduct. Nevertheless, the fact remains that American Home paid petitioner $ 125,000 to settle the latter's claim against its counsel for malpractice in the handling of the tax case. Respondent seeks to distinguish Clark on the grounds that in Clark the attorney's error undisputedly caused the taxpayer to pay more taxes. The essence of respondent's argument is that any error by petitioner's counsel was harmless because petitioner's case was correctly decided by the Tax Court. Under that assumption, any funds petitioner received were an economic benefit and not compensation for injury. We disagree with respondent's position because it ignores the test stated by the United States Court of Appeals for the *319 Sixth Circuit. Respondent does not consider petitioner's claim from which the $ 125,000 was realized. Respondent does not argue that American Home paid petitioner the $ 125,000 for any reason other than petitioner's claim. We conclude that American Home paid the $ 125,000 because of petitioner's claim. Thus, petitioner's claim and American Home's payment was to compensate petitioner for a loss similar to that in Clark v. Commissioner, supra.
Respondent argues alternatively that, in effect, the insurance company paid petitioner's tax, and that as a result petitioner has additional income. Respondent cites Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), and section 1.61-14(a), Income Tax Regs. In Old Colony Trust the taxpayer's employer paid the taxpayer's income taxes in consideration of the taxpayer's labor and services. The Board of Tax Appeals in Clark rejected this argument, saying: "Petitioner's taxes were not paid for him by any person * * *. He paid his own taxes." Clark v. Commissioner, supra at 335. The same is true here. 2. Tax Benefit Rule
*320 Respondent also argues alternatively that recovery of part of the $ 125,000 is income under the tax benefit rule because it is reimbursed interest expenses which petitioner deducted in 1983. Petitioner does not deny that it previously deducted the interest which is a part of its insurance claim or argue that the tax benefit rule does not apply here. Petitioner argues that Rev. Proc. 73-305, 1973-2 C.B. 43, precludes allocating any part of the $ 125,000 to interest. In Rev. Proc. 73-305, supra, respondent ruled that if a partial payment on assessed deficiencies or on mutually agreed but unassessed deficiencies is made without instructions for its application, respondent will apply the payment first to tax, then to penalty, and finally to interest. Thus, Rev. Proc. 73-305, supra, applies where certain partial payments are made to respondent without instructions. Petitioner has not shown that American Home paid the $ 125,000 to respondent; instead, it was paid to petitioner. Therefore, Rev. Proc. 73-305, *321 supra, does not apply and does not preclude us from allocating part of the $ 125,000 to interest. The tax benefit rule generally requires a taxpayer to include amounts in income when events occur that are fundamentally inconsistent with an earlier deduction. Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370, 381-383 (1983). Under the tax benefit rule, petitioner was required to include insurance proceeds in income to the extent the payment was for interest petitioner had previously deducted.[20] Petitioner's insurance claim of $ 466,034 consisted of $ 160,020 for the deficiency and $ 306,014 for interest. Applying that ratio here, we conclude that $ 82,079.30 of the $ 125,000 is included in its income as recovery of previously deducted interest, and that the remaining $ 42,920.70 of the $ 125,000 that petitioner received as malpractice liability settlement was a recovery of capital, and thus is not included in petitioner's gross income. *322 XI. Gain on Sale of Stock
A. Findings of Fact
In 1982 and 1983, petitioner owned shares of stock in General Automotive Parts (General Automotive) and Genuine Parts Co. (Genuine Parts). At that time, B. Mills Corp. (Mills) was petitioner's stockbroker. Mills executed petitioner's buy and sell orders through Prudential-Bache, Inc. (Prudential-Bache), which held petitioner's General Automotive and Genuine Parts shares in street name. Mills had standing oral instructions from petitioner to sell the highest cost basis shares first. Stone instructed Mills whether to buy or sell stock. In 1982 petitioner instructed Mills to sell, and Mills sold 6,190 shares of General Automotive. Mills orally asked Prudential-Bache to sell the highest cost basis shares first. Mills did not know if the oral instructions were executed. After the sale, petitioner exchanged 10,810 shares of General Automotive for 21,620 shares of Genuine Parts and sold 14,000 shares of Genuine Parts. Prudential-Bache sent monthly statements to petitioner reporting these sales. Neither Mills nor Prudential-Bache indicated whether the highest cost shares were sold. Petitioner maintained cost records of *323 each lot that was purchased, the date of purchase, and the price per share. Clark, Schaefer used these records to prepare income tax returns. To compute the gain from the sales of General Automotive Parts stock and Genuine Parts stock, petitioner used the specific identification method and treated the highest cost shares as being sold first. In 1984 the Genuine Parts stock split 3 to 2 which resulted in petitioner's owning 11,430 shares of Genuine Parts stock. Petitioner sold the stock in 1985. It reported the gain based on selling its highest cost basis shares first. In the notice of deficiency for 1982, respondent determined that the gain on the sale of the stock should be computed by using the FIFO accounting method. B. Opinion
1. Background
Generally, the basis of property sold is its cost to the taxpayer. Sec. 1012. Taxpayers may acquire stock on different dates or at different costs and later sell only some of that stock. Section 1.1012-1(c) (1), Income Tax Regs., [21] states that stock sales must be accounted for on a FIFO basis (i.e., treating the stock first acquired as first sold) unless the lot from which the stock is sold can be adequately identified. *324 Section 1.1012-1(c)(2), Income Tax Regs., provides that an "adequate identification is made" if the taxpayer shows that stock certificates from a lot purchased on a certain date or for a certain price was delivered to the taxpayer's transferee. Section 1.1012-1(c)(3), Income Tax Regs., states that stock sold is adequately identified if (a) the taxpayer specifies the particular stock to be sold at the time of the sale, and (b) the broker confirms in writing the taxpayer's instructions within a reasonable time thereafter. The last sentence of section 1.1012-1(c)(3)(i), Income Tax Regs., states that stock so identified is deemed to be the stock transferred even though stock certificates from a different lot are delivered to the taxpayer's transferee. The taxpayer has the burden of adequately identifying which stock is sold and its basis. Rule 142(a); Hall v. Commissioner, 92 T.C. 1027, 1034 (1989). *325 2. Position of the Parties
Respondent stipulated that petitioner orally instructed its broker to sell the highest cost shares first. Respondent points out that petitioner's broker did not provide written confirmation of those instructions as required by section 1.1012-1(c)(3), Income Tax Regs. Respondent argues that: (1) Section 1.1012-1(c) (2) and (3), Income Tax Regs., provides the exclusive alternative to the FIFO accounting method for identifying stock that has been sold, and that (2) because petitioner failed to comply with those provisions, it must use the FIFO accounting method to compute gain on the stock sales. Petitioner concedes that its method of identification of stock does not satisfy section 1.1012-1(c)(3), Income Tax Regs. However, petitioner argues that the regulations are a safe harbor, and not the exclusive means of adequately identifying stock sold. Petitioner relies on cases construing article 58 and article 600 (3) and (4) as amended of Regulations No. 74 under the Revenue Act of 1928, the predecessors of section 1.1012-1(c)(2), Income Tax Regs. In construing that predecessor regulation, the Supreme Court has held that shares of stock can be identified *326 without referring to stock certificates. Helvering v. Rankin, 295 U.S. 123, 128-129 (1935). In construing the validity of the regulation, the Supreme Court said: For the margin trader, while being required to establish the identity of the shares in order to avoid the "First-in, first-out" rule, is left free to introduce any relevant evidence. * * * Indeed * * * the regulation, as we now interpret it, "provides a useful and reasonable rule for ascertaining what stock was sold in cases where there is no proof, or lack of satisfactory proof, of the fact."
Id. at 129-130. This language suggests that there are other ways to identify shares that are sold, and the regulation applies only where there is no proof of other identification. Petitioner also relies on Curtis v. Helvering, 101 F.2d 40 (2d Cir. 1939), and Fuller v. Commissioner, 81 F.2d 176 (1st Cir. 1936), revg. and remanding 31 B.T.A. 154 (1934). Those cases treated instructions that apparently were oral as sufficient to adequately identify stock sold for purposes *327 of the predecessor regulation. In Curtis v. Helvering, supra at 41, the court said: "identification is satisfied, if the margin trader has, through his broker, designated the securities to be sold as those purchased on a particular date and at a particular price." To direct brokers to sell the shares bought at the highest price is also sufficient identification; if there be shares bought at the same price but at different dates, either can be taken without change in the result. * * *
Here, as in Curtis and Fuller, we find that the taxpayer instructed its broker to sell the shares with the highest cost first. 3. Analysis
In Davidson v. Commissioner, 305 U.S. 44, 46 (1938), the Supreme Court held that taxpayers must compute gain based on the cost of shares actually held, not the shares the taxpayer intended to sell. Section 1.1012-1(c), Income Tax Regs., provided relief from the holding in Davidson. Kluger Associates, Inc. v. Commissioner, 617 F.2d 323, 328 (2d Cir. 1980), affg. 69 T.C. 925 (1978). Specifically, section 1.1012-1(c) *328 (3), Income Tax Regs., provides a safe harbor for avoiding the FIFO accounting method for stock sales. Hall v. Commissioner, supra at 1033-1034. In that case we said: When a taxpayer has acquired stock on different dates or at different costs and sells only a portion of that stock, a problem arises identifying the cost or basis of the stock sold. However, the taxpayer has the burden of proving his basis in the specific stock he sells. Respondent, recognizing this problem, has provided by regulations several safe harbor means of complying with the statute requirements.
Id. at 1033. The regulation does not state that it provides the exclusive means of adequately identifying stock. Section 1.1012-1(c) (2) and (3), Income Tax Regs., both state that an "adequate identification is made if". A regulation need not be labeled a safe harbor to be so construed. See, e.g., Ballard v. Commissioner, 854 F.2d 185, 189 (7th Cir. 1988) ( sec. 1.483-1(g), Income Tax Regs., provides safe harbor interest rates for installment sales), revg. T.C. Memo. 1987-128; *329 Bauer v. Commissioner, 748 F.2d 1365, 1369 n.2 (9th Cir. 1984) ( sec. 1.385-6(f)(3), Income Tax Regs., provides a safe harbor within which corporation's debt not excessive), revg. T.C. Memo. 1983-120; Cohen v. Commissioner, 92 T.C. 1039, 1052 (1989) (sec. 1.482-2(a)(2)(iii) and (iv), Income Tax Regs., provides safe harbor interest rates called safe haven interest rates), affd. 910 F.2d 422 (7th Cir. 1990); Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987) ( sec. 1.6661-4(c), Income Tax Regs., not exclusive means of providing adequate disclosure under section 6661); Davidson v. Commissioner, 82 T.C. 434, 439 (1984) ( sec. 1.274-2(e)(4)(iii), Income Tax Regs., provides safe harbor for "used primarily" requirement); Goshorn v. Commissioner, T.C. Memo. 1993-578 ( sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988), provides safe harbor for material participation). The regulation in each case was construed to be a safe harbor *330 even though it was not so labeled. Respondent relies on Kluger Associates, Inc. v. Commissioner, supra at 332. That case is distinguishable from the instant case because in Kluger (a) the taxpayer was the custodian of the stock it was selling, and (b) the taxpayer did not communicate which stock it was selling to the broker. Id. at 325-326, 329-330. We conclude that section 1.1012-1(c) (3), Income Tax Regs., provides a safe harbor, and not the exclusive means to adequately identify stock to avoid the FIFO accounting method of reporting gains on the sale of stock. Adequate identification can be made in many ways. Hall v. Commissioner, 92 T.C. at 1036 (citing Helvering v. Rankin, 295 U.S. 123, 128-129 (1935)). For example, it can be accomplished where the trader, through his broker, designates the securities to be sold as those bought on a particular date at a particular price. Helvering v. Rankin, supra; Hall v. Commissioner, supra.Oral instruction can be sufficient to adequately *331 identify stock sold for purposes of the predecessor regulation. E.g., Curtis v. Helvering, supra; Fuller v. Commissioner, supra at 178. Here, respondent did not dispute that petitioner directed its brokers to sell the shares bought at the highest price. Rather, respondent argues that cases decided before 1958 which predate the regulations are obsolete. Kluger Associates, Inc. v. Commissioner, supra.We disagree. We relied on cases decided before 1958 in Hall v. Commissioner, supra at 1036, where we said: We finally note that adequate identification has long been found possible in situations where specific references to share certificates are not possible. For example, in Helvering v. Rankin, supra, an opinion which was rendered long before the promulgation of these regulations in 1958, the Court was faced with shares which were impossible to identify because of complex trading activity. * * * Rankin is typical of the long-held judicial approach to adequate identification, i.e., that adequate identification *332 is feasible in a wide variety of circumstances. Rankin also indicates that adequate identification can be accomplished where the trader, through his broker, designates the securities to be sold as those purchased on a particular date at a particular price. Accord Kluger Associates, Inc. v. Commissioner, supra; * * *
We conclude that petitioner has sufficiently identified the stock sold. Curtis v. Helvering, supra at 41. XII. Substantial Understatement of Tax
A. Findings of Fact
Petitioner relied on Clark, Schaefer to prepare its tax returns for the years in issue. Clark, Schaefer was an experienced accounting firm that had performed accounting and tax services for petitioner since 1969. Clark, Schaefer exercised its own professional judgment about reporting petitioner's income and deductions. Petitioner completed Schedule F on its returns for 1984 and 1985, relating to the reserve method for computing bad debt deductions. Petitioner did not attach a Form 8275 (disclosure statement). See section 1.6662-4(f), Income Tax Regs., which provides a safe harbor if such a form is properly *333 completed and attached to a return or qualified amended return. Respondent determined that petitioner is liable for additions to tax for substantial understatement under section 6661 for 1984 and 1985. B. Opinion
Section 6661(a) authorizes an addition to tax on underpayments attributable to a substantial understatement of income tax in a taxable year. The addition to tax is 25 percent of the amount of the underpayment attributable to the substantial understatement. Sec. 6661(a). A substantial understatement for corporations exists if in a year the amount of the understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $ 10,000. Sec. 6661(b)(1)(A) and (B). An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b) (2); Tweeddale v. Commissioner, 92 T.C. 501 (1989); Woods v. Commissioner, 91 T.C. 88 (1988). If the taxpayer has substantial authority for his tax treatment of any item on the return, the understatement is reduced by the amount *334 attributable thereto. Sec. 6661(b)(2)(B)(i). Similarly, the amount of the understatement is reduced for any item adequately disclosed on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B)(ii). Respondent has discretion to waive this addition. Sec. 6661(c). Section 6661(b)(2)(B) provides that the amount of the understatement is reduced by that portion of the understatement attributable to the tax treatment of any item if there is substantial authority for that treatment. In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions. Antonides v. Commissioner, 91 T.C. 686, 702 (1988) (Court reviewed), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6661-3(b) (1), Income Tax Regs.
The portion of the understatement attributable to petitioner's tax treatment of the sporting event tickets is the only issue that we conclude lacked substantial authority. Sec. 6661(b)(2)(B)(i). Thus, *335 the understatement is reduced except for petitioner's treatment of the sporting event tickets. There is no substantial understatement because of the reduction in understatement due to substantial authority. Sec. 6661(b)(1)(A) and (B). Therefore, petitioner is not liable for the addition to tax under section 6661. [22]
After disposition of the remaining issue involving petitioner's inventory writedowns, decision will be entered under *336 Rule 155. With respect to disposition of the issues resolved by this opinion, An appropriate order will be issued. Footnotes
1. Cases of the following petitioner are consolidated herewith: Concord Instruments Corp., docket Nos. 2294-91; 20520-91.↩
2. Respondent made an adjustment favorable to petitioner's bad debt reserve for 1983. Respondent's adjustments reflect the continuing effect of petitioner's additions to its bad debt reserve made in prior years.↩
3. Sec. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
(b) Amount of deduction. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Reserve for bad debts. -- In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts.↩
4. Sec. 166(c)↩ was repealed by sec. 805(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2361, because it resulted in deductions being taken for tax purposes for losses that statistically occur in the future. This was inconsistent with the treatment of other deductions under the all events test because allowance of the deduction before the losses occur allows deductions larger than the present value of the losses. H. Rept. 99-426, at 577, 1986-3 C.B. (Vol. 2) 1, 577; S. Rept. 99-313, at 155 (1986), 1986-3 C.B. (Vol. 3) 1, 155.
5. The tax benefit rule generally requires a taxpayer to include amounts in income when events occur that are fundamentally inconsistent with an earlier deduction. Hillsboro National Bank v. Commissioner, 460 U.S. 370, 381-383↩ (1983).
6. In the notice of deficiency respondent disallowed the $ 78,476 interest expense accrued by petitioner because it did not represent interest on a bona fide debt.↩
7. The parties agree that under this result the deduction of $ 90,281 allowed in the notice of deficiency for 1983 should be disallowed.↩
8. The parties were not precise in presenting the issues to be decided. It appears that some of the amounts disallowed in 1982 and 1983 may be valid legal fees of petitioner. On the other hand, petitioner did not argue that. We expect the parties to resolve the ambiguities in the record in the Rule 155 computations.↩
9. In the first PBGC action, petitioner also contended that the plan's benefits were not guaranteed under the plan termination insurance program and that title IV of ERISA, Pub. L. 93-406, 88 Stat. 829, 1003, 29 U.S.C. secs. 1321(b) (1), (5), 1322, 1342(d)(1)(B), was unconstitutional. On June 13, 1977, PBGC moved the District Court for an order terminating the plan under 29 U.S.C. sec. 1342↩. The District Court consolidated the action.
10. 29 U.S.C. sec. 1362(b) (1976) provided: Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of -- (1) the excess of -- (A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over (B) the current value of the plan's assets allocable to such benefits on the date of termination, or (2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.↩
11. The parties stipulated as follows: 16. In 1981, PBGC brought a suit in the District Court against Concord to collect Concord's pension plan liability under ERISA (29 U.S.C. § 1368(d)) as a consequence of Concord's terminating the ERISA-covered Plan. This action is referred to as PBGC Action No. 2. Other than claiming that the statute of limitations barred any liability, Concord did not dispute the fact of its liability under ERISA, but challenged the amount claimed by PBGC and↩ the District Court's jurisdiction over the collection suit. Attached hereto and marked as Joint Exhibits 100-CV and 101-CW are the briefs filed by Concord and the PBGC in the District Court action.
We view this stipulation to be consistent with our finding that petitioner contested its liability to the PBGC because petitioner continued to defend against the merits of the PBGC claim.
12. Respondent concedes that petitioner's 1983 income should be reduced by $ 300,000 to prevent double taxation in reconstructing these transactions.↩
13. In light of our conclusion that the sprinkler system enhanced the value of the building, we need not decide whether petitioner must capitalize the cost of upgrading the pump and housing because it is only a part of a system.↩
14. Petitioner also filed a claim for business interruption. This claim was settled in 1991 with a $ 200,292.99 payment to petitioner. Petitioner did not accrue a loss for business interruption resulting from the fire. The tax consequences of the business interruption claim are not at issue here.↩
15. Petitioner does not attack or otherwise disagree with the validity of this regulation.↩
16. The certificate also backed a bank loan in the amount of $ 20.000.↩
17. In light of our conclusion, we need not decide respondent's argument that petitioner did not obtain the appeal bond to satisfy the judgment.↩
18. In Downey v. Commissioner, 97 T.C. 150, 158-159 (1991), adhered to on reconsideration 100 T.C. 634 (1993) (Court reviewed), we discussed the return of capital theory in the context of sec. 104(a)(2) and cited Clark v. Commissioner, 40 B.T.A. 333 (1939). We said: "We doubt whether the return of capital theory justifies the exclusion from income of the full range of damages found to be excludable under section 104(a) (2), particularly damages received in lieu of lost income." Id.↩ at 159.
19. In Rev. Rul. 57-47, 1957-1 C.B. 23, the Commissioner acquiesced in part with Clark v. Commissioner, supra. In that ruling, the taxpayer received money from her tax return preparer for an error that caused the taxpayer to pay more tax than she otherwise owed. The IRS ruled that the funds were not includable in gross income because they represented compensation for a loss that impaired the taxpayer's capital. In Rev. Rul. 81-277, 1981-2 C.B. 14, the IRS ruled that the concept of economic gain is inherent in sec. 61 and that the taxpayer must personally benefit from the gain, citing United States v. Gotcher, 401 F.2d 118 (5th Cir. 1968). The IRS cited Clark v. Commissioner, supra, for the proposition that "Payments by the one causing a loss that do no more than restore a taxpayer to the position he or she was in before the loss was incurred are not includable in gross income because there is no economic gain." 1981-2 C.B. 15↩.
20. We note that in Clark v. Commissioner, supra at 335, the Board of Tax Appeals did not so hold on this point. However, the Board noted that the taxpayer neither could nor did take a deduction in a prior year of this loss to offset income for the prior year. Id. A distinguished tax commentator noted that the Clark↩ result "is plausible only where the loss is nondeductible, either because the loss is not within any category of deductible losses or because the possibility of reimbursement was anticipated when the loss was incurred." Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 5.8.1, at S5-4 (Supp. I 1994).
21. Sec. 1.1012-1(c), Income Tax Regs., provides in part: (c) Sale of Stock. -- (1) In general. If shares of stock in a corporation are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred shall be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock and in order to determine the holding period of such stock for purposes of subchapter P, chapter 1 of the Code. If, on the other hand, the lot from which the stock is sold or transferred can be adequately identified, the rule stated in the preceding sentence is not applicable. As to what constitutes "adequate identification," see subparagraphs (2), (3), and (4) of this paragraph. (2) Identification of stock. An adequate identification is made if it is shown that certificates representing shares of stock from a lot which was purchased or acquired on a certain date or for a certain price were delivered to the taxpayer's transferee. Except as otherwise provided in subparagraph (3) or (4) of this paragraph, such stock certificates delivered to the transferee constitute the stock sold or transferred by the taxpayer. Thus, unless the requirements of subparagraph (3) or (4) of this paragraph are met, the stock sold or transferred is charged to the lot to which the certificates delivered to the transferee belong, whether or not the taxpayer intends, or instructs his broker or other agent, to sell or transfer stock from a lot purchased or acquired on a different date or for a different price. (3) Identification on confirmation document. (i) Where the stock is left in the custody of a broker or other agent, an adequate identification is made if -- (a) At the time of the sale or transfer, the taxpayer specifies to such broker or other agent having custody of the stock the particular stock to be sold or transferred, and (b) Within a reasonable time thereafter, confirmation of such specification is set forth in a written document from such broker or other agent.
Stock identified pursuant to this subdivision is the stock sold or transferred by the taxpayer, even though stock certificates from a different lot are delivered to the taxpayer's transferee.↩
22. In light of our conclusion above, we need not reach petitioner's contentions that the addition to tax for substantial understatement under sec. 6661↩ should not be imposed for the following reasons: (1) The notice of deficiency did not include an explanation of the basis for imposing the addition as required by sec. 7522; (2) all items at issue were adequately disclosed on the returns; and (3) respondent's failure to waive the addition when petitioner acted with reasonable cause and good faith in reliance upon competent tax advisers resulted in an abuse of discretion by respondent.