van Gestel,
J. This matter is before the Court on an evidentiary hearing for an assessment of damages against the defendant Douglas A. Fineberg (“Fineberg”). On January 24, 2002, Judge Gants issued an order of default against Fineberg for his persistent failure to appear for his deposition. This is the assessment of damages hearing on that default.
On July 29, 2002, Judge Muse allowed the motion of the plaintiff, Stephen M. Pytka (“Pytka”), to amend his complaint. The amended complaint contains the same eight counts, against the same defendants, as the original complaint. The only change in the two complaints is that the amended complaint omitted paragraph 64. Paragraph 64 in the original complaint read in its entirety:
If Pytka had sold his Streamware stock at a second closing pursuant to the terms provided by Crane in the February 27, 2000 draft agreement, the sale would have qualified for long-term capital gains treatment.
It was when the original complaint was in effect that Fineberg was defaulted and, consequently, it is the facts pled in that complaint that are binding on him. However, since Paragraph 64 states only a conclusion of law and not factual allegations, it is therefore not binding on Fineberg.
On October 3, 2002, this Court issued a scheduling order that included the following with regard to the assessment of damages:
There will be an assessment of damages hearing against the defaulted defendant, Douglas Fineberg, on October 28, 2002, at 9:00 a.m. The hearing will be grounded on the original complaint, not the amended complaint. The issue of causation will be considered. Counsel for the parties are to notify the Court by October 23,2002, as to whether a jury will be requested for the assessment hearing.
Counsel have since waived their respective clients’ rights to a trial by jury of this assessment of damages.

FINDINGS OF FACT

The following findings of fact are taken first almost solely from the original complaint, followed by additional findings from the evidentiaiy hearing.
The plaintiff, Pytka, resides in Andover, Massachusetts.
The defendant Gadsby Hannah LLP (“Gadsby”) is a law firm organized under the laws of Massachusetts as a limited liability partnership, with a principal place of business in Boston, Massachusetts. Gadsby was formerly known as Gadsby & Hannah LLP.
The defendant Evan Slavitt is a member of the bar of the Commonwealth of Massachusetts and a partner of Gadsby.
The defendant Fineberg at all relevant times was employed by Gadsby in the position of “of counsel.”
In 1999, Streamware Corporation (“Streamware”) was a privately held Massachusetts corporation based in Norwood, Massachusetts. Streamware was in the business of providing business management software, market analysis tools, and research for the vending and food services industries. John Roughneen (“Roughneen”) and Glenn Butler (“Butler”), Streamware’s founders, collectively owned the majority of Streamware’s issued and outstanding shares.
In October 1998, Pytka became employed by Streamware as its Chairman of the Board of Directors and Chief Executive Officer. On April 1, 1999, Pytka acquired 3,534 shares of Streamware stock, which were subsequently adjusted to 706,800 shares after a 200-for-l stock split. At the time of his acquisition of these Streamware shares, Pytka filed an election with the Internal Revenue Service (“IRS”) pursuant to Section 83(b) of the Internal Revenue Code, which indicated that he acquired his Streamware stock on April 1, 1999.
In late 1999, Crane Co. (“Crane”), a publicly traded company headquartered in Stamford, Connecticut, with operating units that manufactured food-vending *452 equipment, began negotiations for the acquisition of all of the capital stock of Streamware. As the negotiations progressed, the majority shareholders, Roughneen and Butler, made clear their intention to remain with Streamware post-acquisition. Fytka made clear that he did not intend to remain with the company after the acquisition.
Crane eventually offered to purchase Streamware’s stock for a cash payment of $8.5 million, with additional consideration tied to Streamware’s performance post-acquisition, an “earn-out.”
Streamware was represented in the transaction with Crane by John Curran (“Curran”), who acted as Streamware’s business advisor/investment banker, and Bhikhaji Maneckji (“Maneckji”), who acted as Streamware’s legal counsel. Both Curran and Maneckji performed their services to Streamware as a sideline to their full-time employment for Textron, Inc. (“Textron”). Both Curran and Maneckji also had a preexisting business relationship with Roughneen’s wife, who was also a Textron employee.
Fytka concluded that his interests differed substantially from the interests of the two majority shareholders of Streamware because he would not be remaining with Streamware after the acquisition. Fytka was thus concerned with Crane’s proposal to tie a large portion of its consideration for the stock to Streamware’s future performance. In addition, unlike the majority- shareholders, Fytka had not yet held his 706,800 shares of Streamware stock long enough to qualify for long-term capital gains tax treatment.
Fytka decided to obtain separate legal representation in order to protect his differing interests, and in light of the fact that Streamware’s advisors were working as a sideline to their full-time employment at Textron and had a preexisting business relationship with the wife of one of Streamware’s majority shareholders.
Acting on the advice of a business colleague, Ffytka approached Fineberg in December of 1999 about representing him in the Streamware-Crane transaction.
In late 1999, Fineberg was an employee of Gadsby and held the position as “of counsel.” He also held the title of “director” of the emerging business and crisis planning groups of G+H Solutions LLC (“G+H”), a business consulting affiliate of Gadsby. G+H’s website stated:
Fineberg’s legal practice has focused on international business, banking, mutual funds, securities law and corporate finance, emerging businesses, technology ventures and financial institutions. His practice has included both general corporate representation, including negotiation and structure of finance, mergers, acquisitions and dispositions, joint ventures, private offerings, venture capital financing and initial public offerings, as well as securities laws for public companies, mutual funds and their directors and officers, ongoing disclosure and communications, and development of internal corporate securities policies.
Gadsby publicly stated that Fineberg was an attorney who practiced in the areas of corporate law, international business law, banking law, mutual funds, corporate finance and securities law.
Ffytka met with Fineberg at Gadsby’s Boston offices on December 28, 1999 and January 6, 2000, and explained his desire to protect his interests in the transaction. In particular, Fytka identified three concerns on which he wanted Fineberg’s legal advice and representation. For purposes of this proceeding only one of those issues is significant. Fytka wanted to secure long-term capital gains tax treatment on the sale of his 706,800 shares of Streamware stock to Crane under the anticipated stock-purchase agreement between Crane and Streamware.
Fineberg told Fytka that he was qualified to represent Fytka as his attorney on the issues that Ffytka identified. Thus, after discussing Fineberg’s hourly rate and the estimated total charges for the engagement, Ffytka engaged Fineberg as his attorney.
Fineberg confirmed his and Gadsby’s representation of Ffytka in a letter dated January 10,2000, a copy of which is attached to the original complaint. Among other things, Fineberg stated in the letter that he was the “attorney in charge of [Ffytka’s] account” and that he would “assign attorneys to perform services at the lowest charges consistent with the complexity and other requirements of [Efytka’s] specific case.” Fineberg signed the January 10, 2000 letter on behalf of Gadsby.
In fact, Fineberg has never been admitted to practice law in the Commonwealth of Massachusetts. Nor has he been admitted to pratice law in any other state or jurisdiction of the United States.
Neither Fineberg nor anyone else at Gadsby ever informed Pytka that Fineberg was not an attorney admitted to practice law in Massachusetts or in any other state or jurisdiction of the United States.
Gadsby permitted Fineberg to sign letters on its Boston letterhead without disclaiming that Fineberg was not admitted to practice law in Massachusetts.
Fineberg directed and controlled the professional judgment of one or more Gadsby attorneys while he was employed by Gadsby, and Gadsby assisted Fineberg in his efforts.
During the negotiations to consummate the Streamware-Crane transaction, Fineberg failed to achieve Pytka’s goals. In particular, Fineberg failed to secure a structure for the transaction that would have permitted Ffytka to attain long-term capital gains tax treatment in the sale of his Streamware shares.
Crane, Roughneen, Butler, and their counsel were aware, of Ffytka’s desire to obtain long-term capital *453 gains tax treatment for the sale of his Streamware stock.
In a letter of intent to acquire Streamware’s stock dated January 14, 2000, Crane acknowledged that one shareholder “may wish to delay the sale of his shares for up to three months” and affirmed that Crane would “work with [Streamware] toward this objective.” The particular language of the letter reads:
It is understood that one shareholder owning less than 20% of the outstanding shares may wish to delay the sale of his shares for up to three months and, subject to satisfactory documentation designed to ensure that these shares will definitely be sold to Crane, we will work with you toward this objective.
At the time of the January 14, 2000 letter, a mid-February 2000 closing of the Streamware-Crane transaction was contemplated.
Crane’s Mass.R.Civ.P. Rule 30(b)(6)-designated deposition witness, attorney Stephen L. Palmer of Kirkpatrick & Lockhart, testified that “Crane Co. really didn’t care what the specific tax reason or other reason was for the delay, but Crane Co. was willing as stated in the proposal to consider a delayed closing on Mr. Fytka’s shares so long as the only condition would be the passage of time and he would be irrevocably bound to tender his shares.”
Mr. Palmer also testified in his Rule 30(b)(6) capacity that Fineberg never requested of Crane, in late March, to delay the closing on the entire transaction for all sellers to a date after April 2, 2002, nor did Fineberg ever propose to him that Crane be given an option to purchase Pytka’s shares.
After receipt of the Januaiy 14,2000 letter of intent from Crane, Fineberg instructed Streamware’s representatives, Curran and Maneckji, to cease any further direct communications with Fytka. All communications thereafter relating to Fytka were with Fineberg. Neither Curran nor Maneckji spoke again with Pytka on the matters in issue.
On February 27, 2000, Palmer, as counsel for Crane, delivered to Fineberg a draft stock purchase agreement. This draft provided for: a first closing date between March 3 and March 31, 2000, for the purchase of all Streamware stock except Fytka’s; a second closing date between April 3 and April 30, 2000, for the purchase of Pytka’s shares; and an escrow of Fytka’s shares for the period between the first and the second closing dates.
Because of travel and other personal issues for Fytka, he gave Fineberg a durable power of attorney to act as his agent to sign all documents pertaining to the sale of his Streamware stock to Crane.
Within the week prior to March 27, 2000, Fineberg told Fytka that Crane was no longer willing to agree to a second closing for Fytka’s stock. This was not true. Fineberg also told Fytka that Crane would not proceed with the acquisition if Fytka did not sell his stock at the closing on March 27, 2000. This was not true either.
Fineberg also informed Fytka that he had consulted with a tax expert at Gadsby who informed him that a second closing might not have secured the long-term capital gains treatment for Pytka. This was true. He also told Pytka that he and the tax expert had another solution to Pytka’s problem, which they would present to Fytka at a meeting scheduled for March 30, 2000. This was problematical.
In fact, Crane never withdrew its offer to hold a second closing for the sale of Fytka’s stock on or after April 3,2000, and remained at all times willing to have a second closing on or after April 3, 2000. Fineberg was aware of Crane’s position.
Fineberg told Crane’s counsel that Fytka was no longer interested in pursuing a second closing date for the sale of his Streamware stock. This also was not true. Fytka was always willing to have a second closing, and Fineberg knew it.
On March 27,2000, Crane closed on the acquisition of all outstanding Streamware stock, including Fytka’s shares. Fineberg executed the transaction documents on behalf of Pytka, pursuant to the durable power of attorney he had obtained from Pytka. At that time, Crane remitted payment for Pytka’s shares to Fineberg.
On March 30, 2000, after the closing of the Streamware-Crane transaction, Pytka met with Fineberg at Fineberg’s office. Fineberg again informed Pytka that, based on the advice of a Gadsby tax expert, a second closing date for the sale of Pytka’s Streamware stock would probably not have satisfied the minimum one-year holding period for long-term capital gains tax treatment. The tax expert was a Gadsby tax attorney.
Fineberg also informed Fytka that, based on his consultations with the Gadsby tax expert, Fytka could still claim long-term capital gains tax treatment simply by receiving the consideration from the sale of his stock from Gadsby’s clients’ funds account on or after April 3, 2000, even though the sale had closed on March 27, 2000. Fineberg said that if the transaction were conducted following his advice, it would be unlikely that the IRS would detect the actual date of the sale of Fytka’s stock. This advice by Fineberg was documented by his making a handwritten notation on Gadsby’s March 30, 2000 final invoice that April 3, 2000 was “the closing date.”
On March 30, 2000, Fineberg presented Fytka with Gadsby’s invoice in the amount of $26,298.35 for his legal services. Fytka objected to the amount, and Fineberg reduced the bill to $20,500, which Pytka paid. Fytka had previously paid an initial retainer of $1,500.
*454 At the assessment of damages hearing, each side presented as experts lawyers who were highly qualified as tax attorneys. Pytka’s expert was a senior tax attorney at Foley Hoag, LLP, and the defendants’ expert was an experienced tax partner at PriceWaterhouseCoopers.
Both experts agreed that the two-closing scenario was a dubious approach that probably would not have worked to achieve Pytka’s goal of achieving long-term capital gains tax status. Further, both experts agreed that the addition of other limitations on Pytka’s use of his stock during the period from the first to the second closing — particularly the imposition of a proxy in favor of Crane — would have been fatal to the success of gaining long-term capital gains tax status. And both experts agreed that Fineberg’s scheme of closing on March 27,2000, but holding Pytka’s money until April 3, 2000, and then reporting an April 3, 2000 closing to the IRS would subject both Pytka and Fineberg to civil and possibly criminal penalties.
Where the experts seemed to differ was on the subject of whether there was any way that the transaction could have been structured that would have achieved Pytka’s goal. His expert proffered the use of a call option. Under this plan, Crane would have been given an option to call upon Pytka to sell his stock to Crane at a preset price within a period of time covering about three months after April 1, 2000, to some time in July 2000. This, according to the expert, would have left Pytka with all the rights of ownership in his stock until such time as the call was exercised. It also would have put Pytka at some risk, theoretically at least, that Crane would never exercise its option.
The defendants’ expert was skeptical of the success of the call option because, given the history of the transaction — the two-step closing proposal, the es-crowing of stock, the proxy requirement, etc. — he felt that the IRS would consider that there was no true business purpose for the option and that it would be seen as merely substance over form.
As noted above, Pytka’s expert provided opinion testimony to the effect that Fineberg’s actions in representing Pytka, who assumed him to be an attorney, fell below the standards required of a reasonably competent business lawyer or those of a reasonably competent tax lawyer. As a business lawyer, according to the expert, Fineberg should have consulted a tax expert. As a tax lawyer, Fineberg should have come up with a plan, such as the call option, early enough in the process so that it would not suffer the defects that came with the history that Fineberg permitted — and, indeed, augmented — to evolve.
Further, of course, both experts agreed that the two-step closing would not have worked: that the limitations on Pytka’s stock between the first and second closing would have aggravated the deficiencies in the two-step closing; and that the ruse of accepting payment on April 3, 2000, and telling the IRS that that was the effective date of the closing was worse than just poor advice on Fineberg’s part.
Because of Fineberg’s actions and failures, Pytka was subjected to short-term capital gains taxes on the sale of his Streamware stock to Crane. These taxes were paid by Pytka in connection with his 2000 Federal and Massachusetts tax returns. The payments were made by checks dated April 12, 2001, deposited by the taxing authorities on April 24 and 25, 2001.
Pytka’s expert performed calculations relating to Pytka’s tax payments showing the differences between treating Pytka’s sale of Streamware stock on short-term and long-term capital gains bases. They showed the following.
On the short-term capital gains basis at which Pytka paid his taxes: the amount paid to Massachusetts was $143,820; the amount paid to the IRS was $513,016; and the total aggregated $656,836.
If Pytka had been taxed on a long-term capital gains basis, his payment would have been: $67,689 to Massachusetts; $304,679 to the IRS; all aggregating $372,368.
The differences were: $76,131 for Massachusetts; $208,337 for the IRS; all aggregating $284,468.
Pytka’s expert then suggested that because Pytka would be taxed on all of the amount that he receives as a judgment in this case, there would have to be a “gross-up” to make Pytka whole. The gross-up was calculated to be $222,605. This was derived by a formula (amount of tax x rate divided by 1-rate) to produce the amount of tax due on the excess taxes paid ($284,468) plus the taxes on that amount. The rates used in the formula were 38.6% on the Federal taxes and 5.3% on the Massachusetts taxes.
Fineberg’s expert challenged the gross-up with regard to the Federal taxes, suggesting that there would be no Federal taxes on the judgment in this case. He did, however, agree with the formula used by Pytka’s expert.

RULINGS OF LAW

Before stating the Court’s rulings of law, it seems useful to recount the claims against Fineberg as stated in the original complaint. They are: Count II for negligence; Count in for deceit; Count IV for negligent misrepresentation; CountV for violation of G.L.c. 93A, secs. 2 and 11; Count VI for breach of fiduciary duty; and Count VIII for breach of contract.
■ In essence, even though Fineberg was not in fact an attorney, the claims against him are, for the most part, in the nature of legal malpractice. Only the c. 93A claim falls a bit more outside the mantra of legal malpractice than do the others.
As this Court has' already ruled on Pytka’s motion for partial summary judgment against Gadsby, here the legal malpractice is basically predicated upon the attorney’s breach of contract with the client. Hendrickson v. Sears, 365 Mass. 83, 84-85 (1974). However, *455 deceit, breach of fiduciary duty and consumer protection claims may also be brought against an attorney; they generally sound in tort. See, e.g., Clark v. Rowe, 428 Mass. 339, 345 (1998); Brown v. Gerstein, 17 Mass.App.Ct. 558, 567-70 (1984).
Fytka has now established that Fineberg failed to exercise reasonable care and skill in handling the matter for which he was engaged, that Fytka incurred a loss, and that Fineberg’s malpractice was a proximate cause of the loss. See Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass.App.Ct. 107, 113 (1987).
Fytka has proven causation in the sense that his short-term capital gains tax liability probably would not have occurred without Fineberg’s negligence. Williams v. Ely, 423 Mass. 467, 476-77 (1996). See also Meyer v. Wagner, 429 Mass. 410, 424 (1999); McCann v. Davis, Malm & D'Agostine, 423 Mass. 558, 560 (1996). Pytka “incur(red) . . . tax liabilities that [he] might not have incurred but for [Fineberg’s] negligence.” Williams, supra, 423 Mass. at 476. Among other things, Fytka, by Fineberg’s actions and failures, was denied “the opportunity to assess the risk and to follow alternative . . . options.” Id.
Sufficient expert testimony has established that Fineberg failed to exercise the requisite reasonable care and skill of the average qualified practitioner in representing Fytka to meet the standard of care owed. Pongonis v. Saab, 396 Mass. 1005 (1985). Further, given the way that Fineberg and Gadsby held Fineberg out as having broad competence in a wide variety of specialties relating to corporate law, he should be held to the higher standard applied to specialists in those areas. See Fishman v. Brooks, 396 Mass. 643, 646 (1986).
As the Court previously ruled on the prior summary judgment motion, neither causation nor the issue of whether Fineberg’s actions fell below the standard, if he were in fact an attorney, was established by the factual allegations against Fineberg presented solely in the original complaint. Essentially all of the other facts necessary to establish a legal malpractice were established by Fineberg’s default. Further, of course, Fineberg not being an attorney, the allegations still fall well within charges of negligence, deceit, misrepresentation and breach of contract.
At the assessment of damages hearing both Fineberg’s failure to live up to the standards of a reasonable attorney and causation were established. Fineberg’s failures need no elaboration. Causation does.
The issue of whether Pytka, if properly represented, could have achieved his goal of selling his Streamware stock in a manner that would result in taxation at long-term capital gains rates is colored by certain accepted principles of tax law.
“The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether to avoid them, by means which the law permits, cannot be doubted.” Gregory v. Helvering, 293 U.S. 465, 469 (1935). What must not happen, however, is “to exalt artifice above reality and to deprive that statutoiy provision in question of all serious purpose." Id. at 470. In short, there should be a legitimate business purpose for the action taken, not just a scheme to avoid taxes.
The tax consequences which arise from gains from a sale of properly are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.
Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334 (1945).
In assessing matters like that in issue, the Court must follow the benefits and burdens of ownership of Fytka’s Streamware stock and, in so doing, determine when those benefits and burdens passed, or would have passed, from him to Crane.
Here, Fineberg’s expert looked at the situation at the time after most of the negotiations were over, draft agreements had been reviewed and modified, and requests or conditions by Crane, and by Fineberg for Pytka, had been exchanged. Viewed from that vantage point, Pytka’s likelihood of successfully achieving long-term capital gains treatment by suddenly abandoning his request for a two-step closing and pressing instead for a call option in late March 2000 probably would have failed an IRS audit or a court appeal therefrom. Form over substance, with no business purpose for Crane, would probably dictate the outcome.
This Court is of the view, however, that Fineberg’s conduct must be examined from the beginning of his representation of Fytka, starting with the Gadsby engagement letter of January 10,2000. Shortly thereafter, on January 14, 2000, Crane sent its letter of intent “to acquire all of the outstanding shares of Streamware . . .” In that letter, Crane said:
It is understood that one shareholder owning less than 20% of the outstanding shares may wish to delay the sale of his shares for up to three months and, subject to satisfactory documentation designed to ensure that these shares will definitely be sold to Crane, we will work with you toward this objective.
The one shareholder was Fytka.
It was at this time that Fineberg should have known, or gotten advice from tax experts who knew how to structure the transaction in a way that would achieve *456 Fytka’s goal. Then, not much later in the process, Fineberg should have pushed the call option suggested at trial by Fytka’s expert, rather than the two-step closing that everyone — including Fineberg’s own tax expert at Gadsby — agreed would fail. Crane, throughout, remained willing to work toward Fytka’s objective. So did the other shareholders of Streamware, so long as their shares were acquired at the agreed-to price. Further, since Crane wanted to acquire all of the outstanding Streamware stock, there would have been a legitimate business purpose for it, in January 2000, to agree to a call option that gave it the absolute right to acquire Fytka’s stock during the option period. This would not be the kind of form over substance rejected by the Supreme Court in Gregory and Court Holding Co.
Under the call option process, the benefits and burdens of the Streamware stock would have remained with Fytka until Crane exercised the option. Also, although the chances may have been slight, Fytka, until the option was called, would have been at risk that it would not be exercised. These factors, in addition to not having the unfortunate negotiational history caused by Fineberg’s errors from the start, all would have put Fytka in a position of having a strong likelihood of achieving his goal.
Crane, at all times material, had as its objective the purchase of 100% of the Streamware stock. Streamware was a closely held Massachusetts corporation. Since Crane was only buying Streamware’s stock, Streamware would remain a closely held corporation after the purchase. IfPytka’s stock had not been acquired by Crane, there would have been two stockholders after the acquisition: Crane, in the majority; and Fytka, in the minority. This, of course, would have left Fytka with the rights to special fiduciary treatment — like that of a partner — by Crane in matters relating to Streamware. See, e.g., Donahue v. Rodd Electrotype Company of New England, Inc., 367 Mass. 578, 585-89 (1975). Consequently, there cl early would have been a proper business objective for Crane to avoid that situation. Thus, there would have been a legitimate, non-tax-avoidance reason for Crane to accept the call option procedure, had it been proposed.
The defendants argue that Fytka’s testimony at the assessment of damages hearing to the effect that he would have accepted the call option method to achieve his tax goal was not credible and must be considered an ex post facto contrivance. There is a flaw in this argument, however: Fineberg, in his counseling of Fytka, never gave his client the opportunity to assess the risks of a call option and to follow it as an alternative to what was presented. As noted above, this alone is malpractice. See, e.g., Williams, supra, 423 Mass. at 476. Further, this Court credits Fytka’s recent testimony.
As a result of Fineberg’s malpractice, Fytka paid $284,468 more in taxes than if he had achieved long-term capital gains status. Also, he paid Gadsby $22,000 in attorneys fees and costs for deficient legal work. These two figures add up to $306,468.[1] This is the measure of Fytka’s damages on each of Counts II, III, IV, VI and VIII. Of course, there should be only one recovery thereon.
The Court turns next to CountV, brought pursuant to G.L.c. 93A, secs. 2 and 11. Attorneys can be subject to c. 93A claims. See, e.g., Kansallis Finance Ltd. v. Fern, 421 Mass. 659, 671-72 (1996). Certainly, if a lawyer is subject to c. 93A liability for his actions as such, someone pretending to be a lawyer — like Fineberg here — should be no less subject to the rigors of that law.
The issue of Fineberg’s liability on Count V is not a close question. He consciously and deliberately deceived Fytka about his professional status and capacity as a lawyer; took a retainer from him, then billed him for about five times the initial estimate of the costs of the engagement; and assured Fytka that he was qualified to do the work, while failing at almost every step along the way.
The only remaining question relates to multiple damages. Everything that Fineberg did was wilful or knowing conduct. Thus, double damages — in the amount of $612,936 — are to be assessed against him on Count V. Further, on this count, Fytka is entitled to reasonable attorneys fees and costs incurred in this action to date.

ORDER

On the foregoing findings and rulings, this Court Orders the assessment of damages against the defendant Douglas A. Fineberg in the amount of $306,468 on each of Counts II, HI, IV, VI and Vin, and in the amount of $612,936 on Count V, together with interest and costs from April 12, 2001, the date of the injury or damages.
Further, the plaintiff shall be awarded reasonable attorneys fees and costs on Count V. In order to determine those fees and costs, counsel for the plaintiff is directed to serve on counsel for Fineberg an appropriate affidavit and back-up materials within ten days from the receipt of this order, to which Fineberg shall respond within ten days of such service. Thereafter, counsel for the plaintiff shall file a package containing his materials and Fineberg’s opposition or obj ections thereto, similar to a Superior Court Rule 9A filing, and the Court will, if necessary, schedule a hearing thereon.

This Court declines to add a gross-up on the tax aspects of this figure. There is uncertainty between the experts as to whether the major portion of the judgment will be taxed by Federal authorities. Also, the law seems to favor the position that there would be no tax on the judgment here. See Concord Instruments Corp. v. Commissioner, 67 T.C.M. 3036, 3041-42 through 3041-44 (1994); Clark v. Commissioner, 40 B.T.A. 333 (1939); Revenue Ruling 57-47, 1957 Cumulative Bulletin 23. Further, it is not the taxes paid, or that would have been paid, that is the judgment. Rather, those are factors bearing on what an appropriate judgment ought to be.